**HAVILAND & CO., Incorporated, Plaintiff,**

**v.**

**JOHANN HAVILAND CHINA CORPORATION, Montgomery Ward & Co., Incorporated, Rosenthal Glass & Silver Corporation, Arthur Scholder, and Porzellanfabrik Waldershof A. G., vormals Johann Haviland, Defendants.**

**No. 60 Civil 4386.**

United States District Court
S. D. New York.
May 16, 1967.

Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiff, Charles E. McKenney, New York City, W. Brown Morton, Jr., Washington, D. C., McLean, Morton & Boustead, Washington, D. C., of counsel.

Spiro, Felstiner, Prager & Treeger New York City, for defendants, William W. Prager, New York City, Marc S. Gross, New York City, Ostrolenk, Faber, Gerb & Soffen, New York City, Julian Weinberg, New York City, of counsel.

PALMIERI, District Judge.

### Preliminary Statement

This is an action seeking injunctive relief and damages for trademark infringement and unfair competition.

The contending parties are competitors, though not direct competitors, in the chinaware business. The central issues in the case concern the plaintiff's claim to the exclusive right to use trademarks containing the Haviland name and the defendants' conflicting claims with respect to this name and their own use of the Johann Haviland mark.

The reason why the parties may not be deemed direct competitors is that they market different types of chinaware. Plaintiff deals in expensive, high quality chinaware while the defendants deal in promotional type chinaware, which is of a lower grade, and which is sold at substantially cheaper prices.

The Haviland surname, especially when linked with Limoges or France, is a prestigious one in the chinaware business and has generally been associated with the Haviland family, which began its business in New York City in 1829. In 1842, David Haviland, one of several Havilands engaged in the chinaware business in this country, travelled to Limoges, France, and established a factory for the manufacture of chinaware and its shipment to the United States for sale. Almost continuously since then there have been members of the Haviland family, both in Limoges and in the United States, who have been engaged, some-

times competitively,[1] in the chinaware business.

The detailed chronology of the use of the Haviland name in the chinaware field and the relationship of various Haviland family members to such use have been set forth in stipulations of facts entered into by the parties, and have been graphically illustrated in charts marked in evidence. These facts will be referred to below to the extent that they are necessary to the decision of this Court.

It is noteworthy that a substantial part of the factual situation underlying this litigation is not the subject of contention and that many of the facts can be gleaned from documents or evidentiary sources which are not impugned. A forty page stipulation of facts is part of the record.[2]

The plaintiff, owned and controlled by members of the Haviland family, has been known since 1950 as Haviland & Co. Incorporated. It is a New York corporation which was previously named Theodore Haviland & Co., Inc. It imports and sells in this country china made in Limoges, France, bearing the trademarks Haviland, Haviland France and Theodore Haviland. Plaintiff also manufactures and sells china in this country bearing the trademarks Theodore Haviland and Haviland.

The defendant Johann Haviland China Corporation, organized as a New York corporation in 1960, is engaged in the importation and sale in the United States of china made in Bavaria, West Germany, by the defendant Porzellanfabrik Waldershof A.G. vormals Johann Haviland (Waldershof) under the Johann Haviland trademark. The defendant Johann Haviland China Corporation is the wholly-owned subsidary of Waldershof.[3]

Certain salient facts, more extensively developed in the findings of fact, deserve mention at this point.

The parties, and the persons connected with them, have done business in the chinaware field for many years. Their long business histories, so far as they have been revealed by the record, have not been marked by any overreaching or unfair dealing. Despite the charges of fraud and unfair competition which have been exchanged during the course of this litigation, this Court has not found substantiation for any findings of predatory conduct by defendants, or of fraudulent acts by plaintiff.

The present conflict between the parties is attributable to a complex legal and factual situation reaching back many years.

The defendants' use of the Johann Haviland trade name owes its origins to a member of the Haviland family. It was John (Jean) Haviland,[4] a member of Haviland & Co. of New York, who set up

1. Since 1868, the following brands of china have, at various times, been concurrently marketed in the United States under trademarks including the Haviland family name: Haviland Limoges, Haviland France, Charles Field Haviland Limoges, Theodore Haviland Limoges, Robert Haviland et Le Tanneur Limoges and John Haviland. Johann Haviland Bavarian china was marketed in the United States beginning about 1927 when it had a historical but no longer any actual connection with the Haviland family.

2. Parts of this stipulation have been paraphrased or adopted in haec verba in the findings of fact which follow. Any portions not referred to have not been deemed essential to this opinion.

3. The positions of Waldershof and Johann Haviland China Corporation are substantially identical in this litigation. Any references to defendants are intended to allude to these defendants. The defendant Waldershof appeared voluntarily. The action was dismissed, with plaintiff's consent, against the defendants Rosenthal Glass & Silver Corporation and Arthur Scholder at the outset of the trial. The defendant Montgomery Ward & Co., Inc. has acted as a retailer in this country of Johann Haviland china and occupies a relatively minor role in the case.

4. Although referred to in this litigation in the English (John), French (Jean), and German (Johann) forms of his name, the most commonly used name appears to have been Jean. Like most of the Havilands in the last century, he appears to have been bilingual and to have divided his time between France and the United States.

business in Waldershof, Bavaria, in 1907, and permitted the German form of his name to be used in the chinaware business. This circumstance has been a source of intermittent and increasing irritation to the plaintiff over the years, as the intra-company correspondence and other evidence attest.

The first chinaware from the factory at Waldershof was marketed under the John Haviland name. But beginning in 1927, and continuously thereafter, the defendant Waldershof ceased any use of this mark and (except for the interruption caused by World War II) advertised and marketed its chinaware in this country with only the Johann Haviland trademark. This came about at the request of Jean Haviland himself and pursuant to contractual arrangements between his French company (Electroceramiques Jean Haviland) and the defendant Waldershof. It should be noted, parenthetically, that the defendant Waldershof had been granted a United States trademark registration of the mark John Haviland Bavaria in 1928 but that it was not exploited, apparently in deference to the contractual arrangements made with Jean Haviland.

The plaintiff was well aware of the advertising for sale, and the sale, in the United States of this Johann Haviland chinaware but made no protest. Indeed, in 1927, plaintiff's chief executive officer was not "worried about that competition because it was on such a small scale * * *", although he thought "it was a looming danger * *". This view was shared by the managing director of one of the competing Haviland companies in Limoges, France.

The threat of any danger to plaintiff was apparently suspended by World War II but in 1947 the Johann Haviland chinaware returned to the United States market.

In 1948, plaintiff's president, Theodore Haviland, II, had an exchange of correspondence with his father, William D. Haviland, plaintiff's chairman of the board, on the subject of the German mark.

Mr. Theodore Haviland, II, wrote on March 4, 1948:

"As you know, some German china is now coming into the country and among them is a line backstamped 'Johann Haviland, made in Bavaria'."

On May 26, 1948, Mr. William D. Haviland wrote from Limoges as follows:

"As you will see by enclosed documents the Waldershof factory is the sole owner of the trade name 'Johann Haviland' and it has the right to use it as it sees fit. It seems to me that your only redress is against dealers who advertise 'Johann Haviland' china as 'Haviland' china. * * * You will notice that we are buying from John the exclusive right to the use of his name except when written in the German language; not that we have any intention of using it but only to keep it from falling into anyone's hands later on. This you will understand gives us no rights to or control over the name 'Johann Haviland Bavaria' or over the name 'Johann Haviland' with or without 'Bavaria'."

In 1950 the plaintiff wrote defendant Waldershof a letter of protest saying, in substance, that any use by defendant of a trademark containing the name Haviland would cause confusion in the trade and would constitute an infringement of plaintiff's trade name which at that time was Theodore Haviland. This protest came to nothing. No further action was taken by plaintiff and the continued marketing of Johann Haviland chinaware was not affected. In 1949 and in 1951 similar protests, followed by the same result, were made to a distributor of Johann Haviland china, Midhurst Importing Corp. of New York. Theodore Haviland, plaintiff's president, continued to "make difficulties regarding the trademark" of Waldershof. Although it is not clear as to how this was accomplished, this situation resulted, in 1953, in a visit to Jean Haviland at Limoges by a Waldershof representative. The only concrete result of the visit apparently was a recognition by Jean Haviland and

by William Haviland, plaintiff's chairman of the board, that some customers of Waldershof were suppressing the first name Johann and advertising only the name Haviland. In any event, plaintiff appears to have taken no affirmative action and Johann Haviland chinaware continued to be sold in the United States.

In 1954 there was another exchange of correspondence. This occurred about seven years after the resumption of Johann Haviland chinaware sales in this country, following the interruption caused by World War II. At the time they were writing to each other, both Havilands must have known that these sales were in substantial amounts. On June 8, 1954, Mr. William D. Haviland wrote to Mr. Theodore Haviland from Limoges:

"On June 11, 1948, I signed an agreement with Jean Haviland (you have the original draft of this 'Acte de Cession') by which I virtually recognized the validity of the sale by Jean Haviland to Porzellanfabrik Waldershof in 1924 of the exclusive right and ownership of the mark 'Johann Haviland'; that could not be helped because that sale had occurred 24 years before the signing of the agreement by which I purchased from Jean the exclusive right to, and ownership of the two marks 'Jean Haviland' and the mark 'John Haviland'. This agreement of 1948 Jean H. and I signed in good faith and vis-a-vis de Jean I can hardly renege my signature."

On June 14, 1954, Mr. Theodore Haviland, II, wrote to Mr. William D. Haviland:

"Should Johann Haviland by any chance try to sell in Canada, we would have to use the same methods as we did in this country, namely, writing stiff letters to stores who try to create confusion in the public mind by not advertising the product with its full name."

It is apparent that Theodore Haviland's (plaintiff's) complaints were motivated by the fact that some customers of Waldershof failed to use the full name Johann Haviland in selling its chinaware.

In short, plaintiff's entire course of conduct from 1927 until this lawsuit was filed in 1960 was substantially one of awareness and inaction. If the Haviland family history could have been rewritten by plaintiff, it is likely that the Johann Haviland name would never have been established in Waldershof or in the trade. Its existence appears to have been especially galling to the plaintiff in the light of its assiduous attempts in recent years to gather the dispersed Haviland names into its business, by contractual arrangements with members of the Haviland family, and thus to support its claim of Haviland trademark exclusivity; while the defendants, substantially contemporaneously, and with plaintiff's complete awareness, have greatly increased their sales of Johann Haviland Bavaria chinaware in this country.

In 1951 the plaintiff, having changed its name the preceding year from Theodore Haviland & Co., Inc. to Haviland & Co., Incorporated, secured federal registrations of three marks, Haviland, Theodore Haviland-New York and Haviland France. These registrations, and particularly their "incontestability" under the Lanham Act, are relied upon by plaintiff at the threshold as the basis for its claim of exclusivity not only with respect to its use of any mark embracing the surname Haviland but, additionally, with respect to its claim that defendants' Johann Haviland mark is confusingly similar and cannot be used by defendants. These registrations have been much bruited in the case and they have been directly attacked by defendants on the ground that they were procured by fraud.

As the discussion here is intended to show, the architecture and meaning of the Lanham Act were so conceived as to obviate precisely the type of lawsuit as that which is pressed by the plaintiff here—an attack by a registrant against a known concurrent user of a similar mark.

The plaintiff's claims based on its federal registrations are readily refuted. They lack validity because of the basic premise that a trademark is not acquired by registration. The right to a trademark stems from prior appropriation and use.[5] This is recognized in the Lanham Act itself, 60 Stat. 446, § 49,[6] which expressly provides for the preservation of existing rights. Moreover, the major purpose of the statutory provisions concerning incontestability,[7]

5. "'* * * Federal registration does not create a trade-mark. The trade-mark comes from use, not registration, and the right to it is in the nature of a property right based on common law.' Campbell Soup Company v. Armour and Company, 175 F.2d 795 (3rd Cir. 1949).

"'* * * in the United States the exclusive right to the use of a trade-mark has always rested and still rests upon the common law.' 1 Nims, Unfair Competition and Trademarks, § 185, p. 511 (4th Ed. 1947).

"'* * * under accepted theory, a trade-mark right is not acquired by registration. The entire system of trade-mark property and protection was recognized by the common law in England and the United States. It existed long before the Federal Trademark Act, and has remained in full force since its passage.' Callmann, Unfair Competition and Trade-marks, 2d Ed. Vol. 4, p. 2066 (1950).

" 'The right to a trade-mark does not depend upon the statutory enactments. It stems from common law and is perfected by prior appropriation and use. Therefore, registration is not controlling in a suit involving common law rights to a registered mark or in a suit for unfair competition arising out of its use.' Callmann, supra, 2068.

"In accord with the authorities cited by the trial judge, are Armstrong Paint & Varnish Works Co. v. Nu-Enamel Corp., 305 U.S. 315, 324, 333, 59 S.Ct. 191, 83 L.Ed. 195; Brown & Bigelow v. B. B. Pen Co., 8 Cir., 191 F.2d 939, 942 [cert. denied, 343 U.S. 920 [72 S.Ct. 678, 96 L. Ed. 1333] (1952)]; Best & Co. v. Miller, 2 Cir., 167 F.2d 374, 376 [cert. denied, 335 U.S. 818, [69 S.Ct. 39, 93 L.Ed. 373] (1948)]; Huber Baking Company v. Stroehmann Bros. Company, 2 Cir., 252 F.2d 945, 955 [cert. denied, 358 U.S. 829, [79 S.Ct. 50, 3 L.Ed.2d 69] (1958)].

"Many cases are collected in Callmann's text, supra, § 97.3(a) pp. 2066, et seq." Tillamook County Cream. Ass'n v. Tillamook Cheese & Dairy Ass'n, 345 F.2d 158, 160 n. 2 (9th Cir.), cert. denied, 382 U.S. 903 [86 S.Ct. 239, 15 L.Ed.2d 157] (1965).

6. "Sec. 49. Preservation of Existing Rights. Nothing herein shall adversely affect the rights or the enforcement of rights in marks acquired in good faith prior to the effective date of this Act."

The above language can also be found in the historical note at 15 U.S.C.A. § 1051.

Another portion of that Act which suggests the same rule is § 1052(d), 15 U.S.C., which provides that registration must be refused where the mark "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent Office *or a mark or trade name previously used in the United States by another* and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." (Emphasis added.)

7. 15 U.S.C. § 1065 provides, in part, as follows:

"Except on a ground for which application to cancel may be filed at any time under subsections (c) and (e) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable: *Provided*, That * * * (4) no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise."

15 U.S.C. § 1115(b) provides:

"If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein * * *."

so frequently alluded to by plaintiff, is to protect the registrant, after the prescribed five-year period, against cancellation of its mark by a prior user asserting superior rights. In John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314, 316 (7th Cir. 1961), the Court said of incontestability: "This section [15 U.S.C. § 1115] was intended to protect a registrant from having its mark cancelled by a prior user claiming superior rights." The Court quoted with approval from Commissioner Leeds, a well-known trademark authority: "The effect of 'incontestability' is a defensive and not an offensive effect. To put it another way, when the right to use a given mark has become incontestable, the owner's rights in the mark are in no wise broadened, but he is free from challenges of his right to continue to use the mark * * *." This statement is fully supported by another eminent authority: "However, the incontestability clause merely precludes an attack upon the validity of a registration after a certain period of time, and it should not be invocable as an aggressive device and in aid of unfair competition or to shield any inherently defective mark." 4 Callmann, Unfair Competition and Trade-Marks, 2075–76 (2d ed. 1950).

While it is true, as plaintiff argues, that defendants had the opportunity to oppose the plaintiff's registrations or to bring a cancellation proceeding during the five-year period following initial registration in 1951, 15 U.S.C. §§ 1063, 1064,[8] it does not follow that plaintiff's registrations provided it with any offensive weapons against a known concurrent mark. The plaintiff obtained a shield, not a lance. While the defendants could not attack the plaintiff's Haviland trademark registrations on any claim of prior exclusive or superior rights, the plaintiff, on the other hand, did not acquire any basis for attacking the Johann Haviland mark. The concurrent use of this mark for many years was a matter of common knowledge; and so far as the defendant Waldershof was concerned, plaintiff's registrations had no effect upon the status quo ante.

The defendants attack the plaintiff's 1951 registrations of its three marks (Haviland, Theodore Haviland-New York and Haviland France) on the ground that the plaintiff was guilty of fraud in procuring them and that they are therefore not entitled to protection from infringement and should be cancelled. Much effort has been devoted to this aspect of the case by the parties. The charge of fraud stems from the plaintiff's sworn representation to the Patent Office of plaintiff's continuous and exclusive ownership and use by plaintiff and its predecessors of the three marks in question—Haviland, Theodore Haviland-New York and Haviland France. There can be no question of plaintiff's knowledge of defendant Waldershof's concurrent use of the Johann Haviland name when these representations were made to the Patent Office. Nor can there be any doubt that plaintiff's account of its substantially exclusive and continuous use of the Haviland name was an over-simplification of the facts. The brief statement of direct historical legitimacy going back to 1842 attached to the Haviland mark application, for instance, leaves many gaps and presents a picture of plaintiff's business background weighted in support of plaintiff's conclusory statements of exclusive ownership and

---

8. This section deals with the cancellation of trademark registration, and provides, in part, as follows:

"1064. Cancellation of registration

"A verified petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed by any person who believes that he is or will be damaged by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905—

(a) within five years from the date of the registration of the mark under this chapter;"

use. The question immediately suggests itself as to whether the omission to make any reference to the Johann Haviland name in any of the applications was motivated by a desire to prevent a possible refusal of registration under 15 U.S.C. § 1052(d) (see footnote 6). The plaintiff suggests that it was under no obligation to list possible infringers,[9] and that it considered Waldershof to be an infringer. But it seems clear that had plaintiff revealed to the Patent Office the long continued use of the Johann Haviland mark it would have courted one of two possible consequences: (1) rejection of its registration application (15 U.S.C. § 1052(d); or (2) the allowance of concurrent use (15 U.S.C. § 1052(d); and it is clear neither one was acceptable to plaintiff.

Any scrutiny of the documents in support of plaintiff's registrations together with an examination of the relevant statutory provisions leaves the unmistakable impression that the administrative procedures were so managed as to secure the registrations while avoiding any possible confrontation with defendants' mark.

██ On the other hand, it is equally clear that defendants are chargeable with knowledge of plaintiff's registration in 1951 of the three Haviland marks here involved. The alleged fraud pleaded by defendants against plaintiff here could have been asserted, as plaintiff suggests, as the basis for a cancellation proceeding some years ago. 15

U.S.C. § 1064, see footnote 8. The defendants' failure to do so then, makes the fraud allegations in this case smack of tactical afterthoughts. But in fairness it should be added that defendant Waldershof had good grounds for believing that plaintiff's registrations left the Johann Haviland mark unimpaired. Consequently, a failure to join issue in a cancellation proceeding should not now be construed to its prejudice.

It should be noted that the plaintiff had at least a colorable claim to its alleged chain of title. Although no proof of French law was submitted to the Court, the contracts executed in France by various Haviland companies and members of the Haviland family appear to have been effective under French law to assign trademark rights regardless of whether they were naked transfers or transfers accompanied by the sale of a business. Furthermore, no intent to deceive on the part of plaintiff was established. For these reasons this Court declines to find that plaintiff's conduct in the procurement of its three registrations amounted to fraud. Nor has this Court found sufficient basis for substantiation of defendants' charge that plaintiff has fraudulently misrepresented the origin of its merchandise.

██ Costs have not been awarded to either side. The bona fides of both sides in this case in their business dealings over a period of many years, and the circumstances which finally necessitated the resolution of justiciable issues

9. While there is no such express command in the statutory requirements, the affidavits of plaintiff's president, Theodore Haviland, II, accompanying each of the three applications and made presumably in accordance with the registration requirements set forth in 15 U.S.C. § 1051, contain the following identical statement:
"* * * he believes that said corporation is the owner of the trademark * * * and that no other person, firm, corporation, or association, to the best of his knowledge and belief, has the right to use such trademark in commerce * * * either in the identical form thereof or *in such near resemblance thereto as might be calculated to*

*deceive* * * *.*" (Emphasis supplied.)
Compare 15 U.S.C. § 1052(d), which makes mandatory the refusal of registrations where the mark or trade name previously used in the United States by another and not abandoned is likely to cause confusion, mistake or deception when applied to applicants' goods; and which further permits the Commissioner of Patents to register the same or similar marks as concurrent registrations in certain classes of cases. See I Seidel, Dubroff, and Gonda, Trademark Law and Practice 663 (1963) and cases cited; see also, footnote 6, supra.

between them make an award of costs to either side unwarranted. For substantially the same reasons, the defendants' request for counsel fees has not been allowed. Counsel fees may be allowed as costs in exceptional cases at the discretion of the trial court, but ordinarily will not be awarded unless required by statute. Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (4th Cir. 1951); In re Swartz, 130 F.2d 229 (7th Cir. 1942); Gold Dust Corp. v. Hoffenberg, 87 F.2d 451 (2d Cir. 1937). There is no statutory provision for counsel fees in the present type of case and exceptional circumstances calling for such an award do not appear. Moreover, a recent decision by the United States Supreme Court holds that attorney's fees are not recoverable under the Lanham Act. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (U.S. May 8, 1967).

 What this massive record boils down to is that the defendants have built up their business upon the faith of the plaintiff's implicit assurance that it had no real grievance against the defendants; and further, that the trademarks which are the subject of contention have had a concurrent use of such long standing that it would be inequitable for any party to this litigation to be recognized as the possessor of any exclusive or superior rights. In consequence, the plaintiff has been awarded only a measure of limited relief: protection against any misuse, by suppression of the first name or otherwise, of the Johann Haviland mark by defendants' customers.

The findings of fact and conclusions of law which follow are intended to amplify and supplement what has already been said. In addition to disposing of a number of related issues raised in this litigation, such findings and conclusions are intended to demonstrate that the plaintiff has not established its right to prevent the defendants from using the Johann Haviland mark accompanied by an appropriate designation of the German origin of the china.

## FINDINGS OF FACT

### The Parties

1. The plaintiff is a New York corporation engaged in the business of manufacturing, importing and selling chinaware. It is owned and controlled by members of the Haviland family; principal control being held by Theodore II, Frederick and William D. Haviland. Theodore Haviland II, President of plaintiff, and Frederick Haviland, Vice President of plaintiff, are sons of William D. Haviland and grandsons of Theodore Haviland. Plaintiff was organized in 1923 as a successor to a partnership known as Theodore Haviland & Co. and was known as Theodore Haviland & Co., Inc. until June 8, 1950. On that date its name was changed to its present form, Haviland & Co., Incorporated.

2. The defendant Porzellanfabrik Waldershof A.G., vormals * Johann Haviland (Waldershof), is a German corporation, organized in 1924, which manufactures chinaware bearing the trademark Johann Haviland in Waldershof, Bavaria, West Germany.

3. The defendant Johann Haviland China Corporation is a New York corporation, organized in 1960. It is a wholly-owned subsidiary of Waldershof and is engaged in the business of importing and selling Johann Haviland Bavarian chinaware in the United States.

4. The defendant Montgomery Ward & Co., Inc. is an Illinois corporation, doing business in New York. It has purchased Johann Haviland Bavarian china from Waldershof and imported and sold such china in this country.

### The Plaintiff's Relationship to the Haviland Trade Name

5. The plaintiff's predecessor, Theodore Haviland & Co., and before it, the

* "Vormals" means "formerly" in German.

latter firm's individual predecessor, William L. Briggs of New York City, imported chinaware bearing the trademark Theodore Haviland from Limoges, France, and sold such ware in the United States continuously from on or about 1894 until plaintiff's incorporation in 1923. The plaintiff continued to import and sell Limoges china bearing solely the Theodore Haviland trademark until the outbreak of World War II. After the war, in 1946, it additionally commenced to import and sell Limoges ware bearing either the trademark Haviland France, or Haviland. The plaintiff has also, since 1936 and up to the present date, manufactured and sold domestic chinaware under the Theodore Haviland trademark. Moreover, since 1957 plaintiff has manufactured and sold domestic china under the Haviland trademark.

6. Plaintiff and its predecessors, Theodore Haviland & Co. and William L. Briggs, continuously used the Theodore Haviland mark in this country from at least 1894 to the present and sold china bearing such mark in substantial volume.

7. The plaintiff is the record owner of U. S. Trademark Registration No. 538,297, No. 540,451 and No. 541,771, registered on February 20, 1951, April 3, 1951, and May 1, 1951, for the trademarks Haviland, Theodore Haviland-New York (New York being disclaimed) and Haviland France, respectively, and is the record owner of New York Trademark Registration No. R–5384 issued August 12, 1960, for the trademark Haviland.

### The Concurrent Use of the Haviland Surname

8. Members of the Haviland family have been involved in the chinaware field since the early part of the nineteenth century, when six of eight brothers (David, Edmund, Daniel G., Robert Barclay, Richard F., James Cromwell, William, Jr., and John G. Haviland), the sons of an American farmer, first entered the field.

9. The Haviland surname was used in the trade names of competing chinaware businesses organized by one or more members of such family, or their successors, as early as 1848. David and Daniel G. Haviland were then listed, in the New York City Directory of such date, as engaged in the china business at one address under the trade name D. G. & D. Haviland, their brother Richard F. Haviland being concurrently listed as engaged in the crockery business at a different address. Thereafter, and continuously up to the present date (save for the period of the Second World War), there have always been two or more concerns bearing trade names incorporating the Haviland surname concurrently marketing chinaware in New York City. Such concurrent users have included both concerns having places of business in New York City (D. G. & D. Haviland; Haviland Bros. & Co.; Haviland-Petiniand & Co.; Haviland, Merritt & Co.; Haviland, Churchman & England; R. B. Haviland & Son; Charles Field Haviland & Co.; Haviland & Co.; Haviland & Abbott; Theodore Haviland & Co.; Haviland & Abbott, Inc.; Haviland China Co., Inc.; Theodore Haviland & Co., Inc. (the present plaintiff); and the defendant Johann Haviland China Corporation), as well as concerns which advertised and sold chinaware in New York but which did not maintain a separate presence within the State (Porcelain-Robert Haviland et le Tanneur; Robert Haviland and C. Parlon, S.A.; and the defendant Waldershof).

10. Each of the indicated chinaware concerns using trade names including the Haviland family name (except the defendant Waldershof) has included one or more of the eight Haviland brothers or their descendants: D. G. & D. Haviland—David & Daniel G. Haviland (brothers); Haviland Bros. & Co.—David, Daniel G., Robert Barclay and Richard F. Haviland (all brothers); Haviland-Petiniand & Co.—Edwin Haviland (David Haviland's nephew, the son of James Cromwell Haviland); Haviland, Merritt & Co.—Edwin Havi-

land and his cousin Frank Haviland (David Haviland's nephew, the son of William Haviland, Jr.); Haviland, Churchman & England—Robert Barclay Haviland and his sons Charles Field and Frederick Haviland; R. B. Haviland & Sons—Robert Barclay, Charles Field and Frederick Haviland; Charles Field Haviland & Co.—Robert Barclay, Charles Field and Frederick Haviland; Haviland & Co. (1870–1892)—David Haviland and his sons Charles Edward Miller and Theodore Haviland; Haviland & Abbott—Frederick Haviland; Haviland & Co. (1892–1923)—Charles Edward Miller Haviland and his sons George, Paul and John (also known as Johann or Jean and hereafter referred to as Jean); Theodore Haviland & Co.—Theodore Haviland (David Haviland's son), and his son William D. Haviland; Haviland & Abbott, Inc.—Lindsley Haviland (Frederick Haviland's son); Haviland China Co., Inc.—George Haviland; Theodore Haviland & Co., Inc.—William D. Haviland and his sons Theodore II and Frederick Haviland; Porcelain-Robert Haviland et le Tanneur and Robert Haviland & C. Parlon, S.A.—Robert Haviland (Charles Field Haviland's grandson).

11. The Haviland surname was first used in a trademark for a brand of chinaware some time after 1842, when David Haviland established a factory in Limoges, France, for the manufacture of Haviland Limoges ware and thereafter arranged for its importation and sale in the United States. The surname was first used as part of the trademarks of competing concerns engaged in the chinaware business in New York in 1868, when David Haviland's nephew Charles Field Haviland commenced the manufacture of Charles Field Haviland Limoges ware and initiated importation and sale of such china in this country in competition with the Haviland Limoges brand. Thereafter, and continuously up to the present date (save for the period of the Second World War, 1939–1947) there have always been two or more brands of china bearing trademarks including the Haviland surname concurrently marketed in New York.

12. The following distinct brands of chinaware have been concurrently advertised for sale and sold in this country at different periods during the last 100 years: Haviland, Haviland France, Charles Field Haviland, Theodore Haviland, Robert Haviland et Le Tanneur, John Haviland, and Johann Haviland.

13. Members of the Haviland family and their successors have been associated with the marketing of each of the chinaware brands incorporating the Haviland family name (Haviland Limoges china—David, Charles Edward Miller, Theodore, George, Paul, Johann, William D., Theodore II, and Frederick Haviland; Charles Field Haviland Limoges china—Robert Barclay, Charles Field, Frederick, Lindsley, and Robert Haviland; Theodore Haviland Limoges china—Theodore, William D., Theodore II, and Frederick Haviland; John Haviland and Johann Haviland Bavarian china—Jean Haviland and Waldershof; Robert Haviland et Le Tanneur Limoges china—Robert Haviland).

14. On many occasions throughout the period commencing in 1868 and up to the present date, with the sole exception of the period of the Second World War, two or more of the various brands of china having trademarks incorporating the Haviland surname were:

(a) advertised and distinguished from one another by competing concerns in the same issue of the same periodical, and at times on the same page thereof;

(b) listed adjacent to one another in trade listings in the same issue of the same periodical;

(c) sold by competing wholesale distributors located in close proximity to one another and, in at least one instance, in the same building;

(d) sold by the same distributor or retailer; or

(e) advertised for sale by the same retailer in the same advertisement.

15. While the surname "Haviland" simpliciter does not connote a single manufacturer of chinaware, it has become associated by prospective purchasers with expensive, high quality chinaware of French origin.

16. Haviland & Co., a partnership of David Haviland and his sons Charles Edward Miller and Theodore Haviland, was organized in 1870 to continue the importation and sale of Haviland Limoges china in this country. The partnership continued in business until 1892, David Haviland's sons becoming the sole partners in the concern after his death in 1879. In 1892, Charles Edward Miller Haviland and Theodore Haviland, after a personal dispute, severed their business relationship and dissolved the Haviland & Co. firm.

17. Charles Edward Miller Haviland and his sons George, Paul and Johann subsequently established a new Haviland & Co. firm in New York as well as a corresponding partnership in Limoges, France, to continue manufacturing, importing and selling Haviland Limoges ware in this country. These concerns retained the ownership of the factory and other assets of the original Haviland & Co., including its trade name and trademark, and carried on the business substantially continuously from 1892 up to 1923.

18. The Haviland & Co. partnership organized by Charles Edward Miller Haviland and his sons in New York in 1892 owned the trademark rights in this country to the Haviland trademark. Such partnership, in fact, renewed the Federal registrations of the trademarks Haviland & Co. and Porcelaine Haviland (Registration Nos. 19,258 and 19,569) previously granted to the original Haviland & Co. partnership of Charles Edward Miller and Theodore Haviland on March 31, 1891.

19. In 1892, subsequent to his split with his brother, Theodore Haviland established La Porcelaine Theodore Haviland in Limoges, France. That concern built new factory facilities and and subsequently commenced the manufacture of Theodore Haviland Limoges chinaware. This china was imported to and sold in this country from at least as early as 1894 and until about 1908–1909 by its sole agent, William L. Briggs of New York City. On or about 1909, following Mr. Briggs' death, Theodore Haviland & Co. was organized to continue importing and selling Theodore Haviland Limoges ware. Such concern was initially a sole proprietorship of Theodore Haviland, his son William D. Haviland (the Chairman of the Board of Directors of the present plaintiff) being active in the business since 1905 and becoming the head of the business after his father's death in 1919.

20. Haviland & Co. advertised that its Haviland Limoges ware was distinct from the other brands of china incorporating the Haviland family name, and sought to convince the chinaware trade to " . . . sell all imitations under the name in full with which they are stamped . . . " Haviland & Co. did not, during its some 30 years of existence (commencing in 1892), commence legal action against any of its competitors employing trademarks and trade names including the Haviland surname.

21. William L. Briggs and, thereafter, Theodore Haviland & Co. sought, in their advertising, to distinguish the Theodore Haviland brand of Limoges china from the Haviland brand of Limoges ware, Briggs advertising to the chinaware trade that they should:

> "Note The Name
> Theodore
> on the stamp and
> *Avoid Imitations*
> The most popular brand
> of French China is
> *Theodore* Haviland
> Limoges, France."

He further sought to persuade prospective customers to:

" * * * see that the first name, Theodore, is part of the stamp, in order to Avoid Imitations * * * "

Theodore Haviland & Co. made similar representations to chinaware distributors, advertising that:

"The brand of *Theodore* Haviland is the most popular brand of French China, and customers should see that the first name, *Theodore*, is part of the stamp * * *"

22. Theodore Haviland & Co. apparently believed that its use of the Theodore Haviland trademark had led to confusion of source in the minds of prospective purchasers of Haviland Limoges china that resulted to its advantage. William D. Haviland, plaintiff's Chairman, admitted, during testimony taken in connection with the present proceeding, that such concurrent use resulted in " * * * absolute confusion, and I might add that we profited by it * * *".

23. In 1923 the Haviland & Co. partnership was incorporated as Haviland China Co., Inc., the new corporation acquiring the trademarks, good will and other assets of Haviland & Co., and continuing to conduct the latter's chinaware business in this country.

24. In 1923, Theodore Haviland & Co. was incorporated as Theodore Haviland & Co., Inc., the new corporation acquiring the trademarks, good will and other assets of Theodore Haviland & Co., and continuing to conduct the latter's chinaware business in this country.

25. Haviland China Co., Inc. and Theodore Haviland & Co., Inc., the successors to the respective partnerships, did not immediately change their marketing practices but continued to import and sell their Haviland Limoges and Theodore Haviland Limoges china, in competition with each other.

26. Haviland China Co., Inc. continued the practice of its predecessor, Haviland & Co., asserting to the chinaware trade that its trademarks Haviland & Co. and Haviland France designated the " * * * *genuine* Haviland china * * *", and advertising that "every piece of *genuine* Haviland china—the product of the orig-inal Haviland established by David Haviland in 1837—bears the trademarks * * *". Haviland China Co., Inc. further sought to distinguish its goods from those of its competitors by advertising that:

" * * * any other ware with the name Haviland on its stamp cannot be lawfully sold as Haviland China, or without the mention of the name in full with which it is stamped.

"Any infringement upon our exclusive right to the denomination of *'Haviland China'* for our ware would oblige us to sue the offender for damages * * *"

Haviland China Co., Inc., did not, however, at any time during its existence, commence legal action against the plaintiff, defendants, or any of the other concerns referred to hereinafter which employed trademarks or trade names including the Haviland surname.

27. U. S. Trademark Registration No. 221,148, for Haviland France, was granted on November 23, 1926, and trademark Registration No. 277,592, for a composite mark including the words "Manufactured and decorated by Haviland-France", was granted on November 18, 1930, to Haviland et Cie, S. A., the French manufacturer of chinaware for Haviland China Co., Inc.

*Jean Haviland and the Factory at Waldershof, Bavaria*

28. In 1907, Jean Haviland, while a partner in Haviland & Co., organized a business firm as a sole proprietorship under his name in its German form for the manufacture of chinaware in Waldershof, Bavaria, Germany. The funds to purchase the land and to erect the factory utilized for such business were loaned to Jean Haviland by Haviland & Co., and the real estate and buildings subsequently used by Jean Haviland's firm were owned by Haviland & Co.

29. The Johann Haviland firm registered the trademark Johann Haviland Bavaria in Germany in 1910 and exhibited its ware at International Fairs in Regensburg, Austria, and Turin,

Italy, in 1910 and 1911, respectively. Subsequently, in 1912, the Johann Haviland firm commenced marketing of its chinaware in the United States, Haviland & Co. serving as its initial exclusive distributor in this country. The chinaware purchased by Haviland & Co. from the Johann Haviland firm for distribution in the United States was sold under the trademark John Haviland, shipments of such ware during the period from 1912 to 1914 averaging 1000 marks (about $250) per month. The Waldershof factory thereafter ceased production of china during the First World War and did not resume sales to United States customers until about 1922.

30. In 1918 Jean Haviland and his brother Paul withdrew from the Haviland & Co. partnership. George Haviland became the sole proprietor in 1921, upon the death of his father Charles Edward Miller Haviland. Subsequently, the Johann Haviland firm made no further sales or shipments of china to Haviland & Co.

31. In 1924, a German corporation known as Porzellanfabrik Waldershof A.G. (the present defendant Waldershof) was organized to acquire the assets and chinaware business of the Johann Haviland firm, and to continue such business. The new company purchased the tangible assets previously used by the Johann Haviland firm from Haviland & Co. At the same time, it acquired from Jean Haviland all his right, title and interest in and to his former business. Jean Haviland additionally granted the new company the right to use his name in its trade name in the German form in which it presently appears, and gave the company the further right to use his name as a trademark for its goods, reserving only the right to revoke such grant with respect to the use of his name in languages other than the German, e. g., the English (John Haviland) or French (Jean Haviland) languages.

32. Subsequent to its organization, the defendant Waldershof continued to manufacture Johann Haviland and John Haviland Bavarian china, and continued to ship the latter goods to this country for sale. In 1927, Waldershof registered the Jean Haviland and John Haviland Bavaria trademarks in Germany and applied for registration of the latter mark in the United States; federal registration of the John Haviland Bavaria trademark was granted on March 27, 1928, under Registration No. 240,536. In 1927, after being advised of Waldershof's German registrations of the Jean Haviland and John Haviland Bavaria marks, Jean Haviland (on behalf of the French concern Ets. Electroceramiques Jean Haviland, of which he was then the Managing Director) notified Waldershof of the revocation of his previous grant of the right to use his first name in any language other than German, while acknowledging Waldershof's exclusive right to use his name in the German form "Johann Haviland". Subsequent to such notification, and in 1927, Waldershof ceased using the trademark John Haviland and commenced to use only the trademark Johann Haviland to designate the Bavarian china which it manufactured in Germany and sold in the United States and elsewhere.

33. Waldershof has sold Johann Haviland Bavarian ware to purchasers in this country substantially continuously from 1924 and up to the present date, with the sole exception of the period of 1939–1947. Purchasers of Johann Haviland Bavarian china during this period have included many chinaware jobbers, prominent department stores and other retailers.

(a) At various times during the period from 1928 to 1939, Johann Haviland Bavarian ware was purchased, *inter alia*, by the following jobbers:

| | |
|---|---|
| Associated European Ceramics | New York, New York |
| Continental Ceramics Corp. | New York, New York |
| Borgfeldt & Co. | New York, New York |

At various times during the same period Johann Haviland Bavarian ware was purchased, *inter alia*, by the following prominent department store or catalog distribution outlets:

| | |
|---|---|
| Marshall Field & Co. | Chicago, Illinois |
| The Geo. H. Bowman Co. | Cleveland, Ohio |
| Sears Roebuck & Co. | Chicago, Illinois |
| Brinsmaid Co. | Des Moines, Iowa |

(b) At various times during the period from 1947 and up to the present date, Johann Haviland Bavarian ware was purchased, *inter alia*, by the following chinaware jobbers:

| | |
|---|---|
| Croyden China Co. | Chicago, Illinois |
| Borgfeldt Corp. | New York, New York |
| Crownford China Co. | New York, New York |
| J. & I. Block | New York, New York |
| Johann Haviland China Co. | New York, New York |
| Midhurst Importing Co. | New York, New York |
| Steelmaster, Inc. | New York, New York |
| Rosenthal-Block China Corp. | New York, New York |

At various times during the same period Johann Haviland Bavarian ware was purchased, *inter alia*, by the following prominent department store or catalog distribution outlets:

| | |
|---|---|
| Abraham & Strauss Co. | Brooklyn |
| B. Altman & Co. | New York |
| Bamberger's | Newark |
| Bloomingdale Bros. | New York |
| Burdine's | Miami |
| Capwells | Oakland |
| Carson, Pirie, Scott & Co. | Chicago |
| City of Paris | San Francisco |
| Cohen Bros. | Jacksonville |
| The Dayton Co. | Minneapolis |
| The Famous Barr Co. | St. Louis |
| Folley's Houston | Houston |
| Frederick & Nelson | Seattle |
| Gimbel Bros. | New York |
| The Hecht Co. | Washington |
| Highbee | Cleveland |
| Horne's | Pittsburgh |
| J. L. Hudson Co. | Detroit |
| Hutzler's | Baltimore |
| John Shillito | Cincinnati |
| John Wanamaker & Co. | Philadelphia |
| Kaufmann's | Pittsburgh |
| R. H. Macy & Co. | New York |
| Marshall Field & Co. | Chicago |
| The May Co. | Cleveland and Los Angeles |
| Montgomery Ward & Co. | Chicago |
| M. O. Neil Co. | Akron |
| Rich's | Atlanta |

| | |
|---|---|
| J. W. Robinson Co. | Los Angeles |
| Strouss Hirshberg | Youngstown |
| Strawbridge Clothier | Philadelphia |
| Thalheimer Bros. | Richmond |
| The White House | San Francisco |
| Wiebold | Chicago |

34. The volume of Johann Haviland sales in the United States was relatively small during the period from 1928 to 1939, averaging about $6,000.00 per year during the years from 1928 to 1933, and further diminishing during Hitler's rise to power prior to the Second World War. After the war, the volume of Waldershof's sales of Johann Haviland Bavarian china in this country increased from about $50,-000.00 per year in 1947 to about $450,000.00 per year in 1965, on the wholesale level. The wholesale volume of sales of Johann Haviland china during the aforesaid period was as follows:

| Year | Sales | Year | Sales |
|---|---|---|---|
| 1928 | $ 5,680. | 1951 | $ 60,237. |
| 1929 | 11,184. | 1952 | 23,338. |
| 1930 | 3,908. | 1953 | 28,292. |
| 1931 | 10,113. | 1954 | 14,322. |
| 1932 | 418. | 1955 | 8,241. |
| 1933 | 4,929. | 1956 | 6,090. |
| 1934 | 811. | 1957 | 21,329. |
| 1935 | 508. | 1958 | 406,311. |
| 1936 | 468. | 1959 | 764,465. |
| 1937 | 337. | 1960 | 560,165. |
| 1938 | 197. | 1961 | 636,159. |
| 1939 | 1. | 1962 | 681,218. |
| 1947 | 51,804. | 1963 | 462,065. |
| 1948 | 106,774. | 1964 | 404,404. |
| 1949 | 36,114. | 1965 | 446,096. |
| 1950 | 25,986. | | |

35. The landed cost in the United States of chinaware is approximately 150% the wholesale dollar volume, due to the imposition of tariff duties. The retail dollar volume of Johann Haviland Bavarian china is about twice the landed cost, based upon generally prevailing jobber and retailer profit margins. Accordingly, the retail dollar volume of Johann Haviland sales in the United States has increased approximately nine-fold from 1947 to 1965, from about $150,000 per year to about $1,350,000 per year. There were fluctuations during this period from about $150,000 in 1947 up and down to a level of about $64,000 in 1957, with a sharp rise in 1958 to about $1,218,000.

### Charles Field Haviland Chinaware

36. Charles Field Haviland Limoges chinaware has been sold in the United States, concurrently with the marketing of Haviland Limoges, Theodore Haviland Limoges and John Haviland or Johann Haviland Bavarian ware. Prior to the Second World War, such chinaware had been sold to customers in this country substantially continuously from 1868, when R. B. Haviland & Son was organized, up to at least 1934.

Charles Field Haviland importation and sales were successively conducted, in New York City, by R. B. Haviland & Son (1868–1870), Charles Field Haviland & Co. (1870–1892), Haviland & Abbott (1892–1903), Haviland & Abbott, Inc. (1903–1927) and Gunthel and Cruveilher (1927 to at least 1928).

37. Robert Haviland, a grandson of Charles Field Haviland, in partnership with his brother-in-law Pierre Le Tanneur, commenced the manufacture of Robert Haviland et Le Tanneur Limoges chinaware in Limoges in 1926. Such china was subsequently sold in the United States prior to the Second World War, and was advertised at least during 1938 and 1939 by Levy Brothers China Co. of New York City.

38. On March 28, 1941, William D. Haviland and his wife; Henri Francis De Luze and his wife; and Laurens D'Albis and his wife, entered into an agreement with Robert Haviland, at Limoges, purporting to transfer to the latter the Charles Field Haviland trademark, which had been acquired approximately one month before from Porcelaines, G.D.A., the former manufacturer of Charles Field Haviland Limoges chinaware.

39. In 1942, Robert Haviland organized a French company known as Robert Haviland & C. Parlon, S.A. which, at least since 1949 and up to and including the present date, has sold Charles Field Haviland Limoges chinaware to jobbers and retailers in this country. Such china has recently been on sale in the New York metropolitan area in the Altman's and Bloomingdale's department stores and presumably, is currently available for retail purchase.

### Haviland China Co., Inc.

40. Haviland China Co., Inc. (the successor to Haviland & Co.) imported and sold Haviland Limoges chinaware in the United States, commencing in 1923. Such brand was sold in competition with the Theodore Haviland Limoges ware and Charles Field Haviland Limoges ware concurrently marketed in this country. In 1930, in the midst of the depression, the Haviland China Co., Inc. business began to fail. The dissolution of the corporation was approved by the stockholders on February 4, 1931, and a Certificate of Dissolution executed on February 10, 1931.

41. The Haviland Limoges chinaware inventory was liquidated in April, 1931, by Mandel Bros., a Chicago department store, which advertised on April 12, 1931, the sale of "* * * Haviland China Co.'s entire stock * * * because the genuine and original Haviland Co., Limoges, France is going out of business * * *". By April 28, 1931, all the saleable merchandise of Haviland China Co., Inc. had been sold. The other assets of the company, including its lease, were also sold, and the business was liquidated. Concurrently, the factory and other assets of the French company (Haviland et Cie, S.A.), which had manufactured the Haviland Limoges ware at Limoges, were also liquidated, the patterns, molds, lithographic plates, trade name and trademarks being transferred to Porcelaine G.D.A., S.A. of Limoges.

### Plaintiff's Asserted Title to the Haviland Name

42. Plaintiff's claim of exclusive title to the name "Haviland", simpliciter, is based upon the use of the Theodore Haviland mark beginning in 1892 and upon a series of agreements entered into between 1931 and 1947 though which plaintiff asserts it is the only lawful claimant to be successor to Haviland et Cie, S.A. of Limoges and Haviland China Co., Inc. of New York. An agreement was entered into on April 22, 1931, between George Haviland and one Marcel Champin, such individuals being referred to therein as the sole creditors of Haviland et Cie, S.A., and George Haviland further acting in the capacity of the Chairman of the Board of Directors of Haviland China Co., Inc. Such agreement recited the transfer of "the business and stock-in-trade" of Haviland China Co., Inc. to Haviland et Cie, S.A. for "the nominal price of $100."

43. A subsequent agreement was entered into on July 27, 1931, between Haviland et Cie, S.A. and Porcelaines G. D.A., which was then manufacturing Charles Field Haviland chinaware at Limoges. Such agreement recited the transfer of all the assets of Haviland et Cie, S.A., including its patterns, molds, Lithograph plates, " * * * goodwill, trade name, (and) all trademarks * * * " to Porcelaines G.D.A.

44. A number of shipping documents issued by Porcelaines G.D.A. during the period from 1933 to 1939 have been placed in evidence. Various of these documents indicate that the chinaware thus shipped bore the G.D.A. or Charles Field Haviland trademarks owned by Porcelaines G.D.A. The documents also show that during this period shipments of chinaware having the same shapes previously used for Haviland china were made by Haviland et Cie and state that the packing casks in which such goods were shipped were marked "H & Co".

45. Porcelaines G.D.A., a French company, identified its predecessors ("Anciennes Maisons"), including Haviland & Co., on the letterhead which it employed in December 1938. This letterhead, when considered with the shipping documents of this period, indicates that sales of Haviland brand china were made in this country during the period from 1931 to 1941.

46. The plaintiff's President, Theodore Haviland II, testified from recollection and from business records that importation into the United States by plaintiff of chinaware made in Limoges and marked Haviland and Haviland France began in 1946 and has continued in substantial volume ever since. His testimony is accepted as credible.

47. On February 18, 1941, the liquidators of Porcelaines, G.D.A. entered into an agreement with William D. Haviland and his wife, Henri Francis De Luze and his wife (William D. Haviland's sister), and Laurens D'Albis and his wife (William D. Haviland's other sister). Such agreement recited the transfer of G.D.A.'s assets, including those set forth as having been previously acquired from Haviland et Cie, S.A., to the named individuals.

48. A fourth agreement was entered into on April 17, 1947, between Henri Francis De Luze and his wife, Laurens D'Albis and his wife, and Harold Haviland (one of William D. Haviland's sons) and his wife, on the one hand; and the plaintiff corporation on the other hand. Such agreement recited the transfer to the plaintiff of those business assets which were the subject of the successive transfers from Haviland China Co., Inc.; Haviland et Cie, S.A., Porcelaines G.D. A.; and William D. Haviland, Henri Francis Le Luze, Laurens D'Albis, and their respective wives.

49. William D. Haviland and his wife entered into an agreement purporting to transfer the interest received in 1941 to their son Harold Haviland and his wife. Henri Francis De Luze and his wife, Laurens D'Albis and Harold Haviland were engaged in the chinaware business between 1941 and 1947.

50. Plaintiff's French affiliate (La Porcelaine Theodore Haviland) employed the designation "Haviland France Fondee en 1842" on its letterhead in 1941 and 1946. La Porcelaine Theodore Haviland had not, however, as of such dates, acquired any business in this country, or any assets used in connection with such a business, relating to the Haviland or Haviland France trademarks.

51. Haviland and Haviland France china was sold in this country by plaintiff beginning in 1946. In March, 1949, a trade listing identifying plaintiff as the source of such ware appeared, and in August, 1949, plaintiff placed an advertisement asserting its claim of exclusive right to use of the Haviland name, and informed the chinaware trade of such claim.

52. While there is no evidence of the precise volume of plaintiff's sales of Haviland or Haviland France china since 1949, such sales have been substantial and nationwide and have served to as-

sociate the Haviland name with china-ware of the highest quality.

## Plaintiff's Trademark Registrations

53. Plaintiff renewed neither the "Haviland France" nor the "Manufactured and decorated by Haviland France" trademark registrations previously registered (Finding #27) by Haviland et Cie, S.A. Such registrations expired in 1946 and 1950, respectively.

54. The plaintiff's predecessors in interest continuously used the Haviland or Haviland France trademarks for periods of at least five years preceding the February 15, 1950, and December 5, 1949, filing dates, respectively, of the applications for federal registration of such marks.

55. Plaintiff's representations to the U. S. Patent Office in its 1949 and 1950 applications for federal registrations of Haviland and Haviland France trademarks, although made in good faith, were inaccurate insofar as they related to the nature and extent of the alleged prior use of such marks by it and its predecessors. Theodore Haviland II admitted in correspondence with William D. Haviland in 1948 his knowledge of the importation and sale of Johann Haviland Bavarian chinaware in the United States at such time. Plaintiff's Chairman, in such correspondence, stated that " * * * the Waldershof factory is the sole owner of the trade name 'Johann Haviland' and it has the right to use it as it sees fit * * *".

56. Plaintiff made incomplete or inaccurate statements to the Patent Office when, in the applications for federal registration of the Haviland and Haviland France trademarks, it represented that it and its predecessors in interest had made substantially exclusive and continuous use of such marks; in the case of the Haviland mark from about the year 1842, and in the case of the Haviland France mark from 1892.

57. The affidavits filed by plaintiff, in connection with the Haviland and Haviland France registrations (Finding #7), were filed some 13 days after publication of the application for federal registration of the Charles Field Haviland trademark (Finding #70 below) for opposition, and only 13 days before instituting an opposition to the registration of such mark.

## The Estoppel and Laches Issues

58. Haviland & Co. financed the chinaware business initially organized by Jean Haviland, one of its partners, in Waldershof, Bavaria, in 1907. Further, Haviland & Co. was aware of the initial marketing of John Haviland Bavarian china by such firm in this country in 1912, serving as the initial and sole distributor for china bearing the John Haviland trademark from 1912 to 1914.

59. Both plaintiff and Haviland China Co., Inc., were aware, during the period from 1927 to 1931, of the advertising for sale, and sale, in the United States of the defendants' Johann Haviland chinaware. At such time plaintiff's Chief Executive Officer was not " * * * worried about that competition because it was on such a small scale * * * ", although he thought " * * * it was a looming danger * * * ".

60. In 1947, when plaintiff owned and occupied premises at 26 West 23rd Street, New York City, one of its tenants (J & I Block) was advertising and selling Johann Haviland chinaware. J & I Block, and a related company (Steelmasters, Inc.), made direct purchases of Johann Haviland china from Waldershof for resale, and additionally solicited direct sales to retailers in the United States, for which they received commissions, from 1947 to 1952. A successor corporation (Rosenthal-Block China Corporation) continued in such capacities from 1952 until 1960, when the Johann Haviland China Corporation was organized. Plaintiff's officers, one of whom frequently visited the J & I Block showroom and saw Johann Haviland chinaware on display, had knowledge of such facts.

61. Plaintiff did not institute any action against J & I Block or Steelmasters, Inc. or Rosenthal-Block China Corporation for injunctive or other relief with respect to the continued advertising for sale or sale of such chinaware, during the 13-year period in which such firms continued to market Johann Haviland Bavarian chinaware in this country.

62. In an agreement entered into on June 11, 1948, with Jean Haviland, William D. Haviland (the Chairman of plaintiff's Board of Directors) recognized that Jean Haviland had some 25 years theretofore entered into a contract with the defendant Waldershof granting the latter the full and unrestricted ownership of the trademark Johann Haviland. In such agreement, William D. Haviland further undertook to carry out all the obligations previously contracted for by Jean Haviland.

63. In December, 1949, and again in November, 1951, plaintiff objected to the importation and sales of Johann Haviland chinaware by the Midhurst Importing Corporation, a chinaware distributor. In correspondence with such distributor plaintiff asserted that Waldershof " * * * does not have any rights to use the name 'Haviland' * * '", adding that plaintiff would take " * * * strong objection to the introduction and use of the name 'John Haviland China', which we would feel compelled to assert and take action", and further asserted that " * * * confusion must inevitably result from the use of the name 'Johann Haviland' in this market * * * '".

64. Midhurst Importing Corporation commenced to import and sell Johann Haviland Bavarian chinaware in 1950, and continued such sales during the subsequent years through 1955. Midhurst purchases of Johann Haviland chinaware during the indicated period aggregated the following wholesale volumes:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1950 | $ 9,409. | 1953 | $24,050. |
| 1951 | 49,128. | 1954 | 11,258. |
| 1952 | 26,123. | 1955 | 36,621. |

The retail volume of business corresponding to such purchases by Midhurst was approximately three times the indicated wholesale volumes, as set forth in Finding #35.

65. The plaintiff did not institute any legal action against Midhurst, either during the period from 1950 to 1955 or thereafter, for injunctive or other relief with respect to its continued marketing of Johann Haviland Bavarian china in the United States.

66. On January 13, 1950, plaintiff wrote directly to the defendant Waldershof, charging that Waldershof's importation and sale of Johann Haviland Bavarian chinaware in the United States constituted trademark infringement and unfair competition with the plaintiff. The plaintiff did not institute any legal action for injunctive or other relief with respect to such importation and sale until 1960, when the present suit was initiated.

67. Plaintiff's President recognized in correspondence with his father in June of 1954, that " * * * we do not have much of a case here in the U. S. due to the fact that Johann Haviland had registered their trade mark in the 1920's". In response, William D. Haviland acknowledged that he had virtually recognized the validity of the sale by Jean Haviland to Porzellanfabrik Waldershof in 1924 of the exclusive right and ownership of the mark Johann Haviland; that this could not be helped because that sale had occurred 24 years before the signing of the agreement of June 11, 1948, by which he purchased

from Jean the exclusive right to, and ownership of the two marks "Jean Haviland" and the mark "John Haviland"; adding "This agreement of 1948 Jean H. and I signed in good faith and vis a vis de Jean I can hardly renege my signature."

In reply, Theodore Haviland II acknowledged that plaintiff had, as of such date, determined to assert its purported rights solely against retail stores which improperly advertised Johann Haviland ware.

68. Plaintiff's Chief Executive Officer knew of the advertising for sale, and sale, of Charles Field Haviland Limoges chinaware in the United States as early as 1905. Plaintiff was also aware of the continued sales of such product after the Second World War, when it adopted the Haviland and Haviland France marks.

69. On May 25, 1951, the plaintiff wrote to Transocean Merchandise Exchange, Inc., a company which was then importing and selling Charles Field Haviland Limoges ware in this country, asserting that retailers handling the Charles Field Haviland brand had, from time to time, advertised the same as "Haviland" china, and asking Transocean to inform its customers to always identify the Charles Field Haviland ware by the complete trademark name. The plaintiff did not, in 1951 or at any time prior to the present date, institute any action for injunctive or other relief with respect to the continued sales of Charles Field Haviland Limoges chinaware in this country.

70. On October 22, 1954, Robert Haviland & C. Parlon S.A. filed an application for federal registration of the Charles Field Haviland trademark. Upon the passage of such application for publication in 1956, the plaintiff commenced an opposition proceeding, asserting that registration of the Charles Field Haviland trademark would be likely to lead to confusion of prospective purchasers of plaintiff's and Robert Haviland & C. Parlon's respective brands of chinaware. In 1960,

after private negotiations between the parties, the application for registration of the Charles Field Haviland trademark was withdrawn and consequently the plaintiff's opposition proceedings terminated.

71. In reliance upon plaintiff's inconsistent actions and inactivity, and upon conduct which was tantamount to plaintiff's implicit consent, defendant Waldershof expanded the Johann Haviland business from a retail volume of about $15,000 in 1928 to $150,000 in 1947, and, after various fluctuations, to about $1,350,000 in 1965. Waldershof's business would be irreparably harmed if enjoined from the continued use of such trademark.

72. The defendants, however, are chargeable with a full awareness of the concurrent use of the Haviland, Haviland France, Johann Haviland, Theodore Haviland-New York, and Theodore Haviland marks for a period of many years prior to this litigation and during this period defendants made no protest and took no action.

73. In 1926 (when plaintiff was importing and marketing Theodore Haviland Limoges ware in competition with Haviland Limoges china marketed by Haviland China Co., Inc.), William D. Haviland entered into a written agreement with the partnership of Robert Haviland and Pierre Le Tanneur, which had previously commenced the manufacture and sale of Robert Haviland Limoges chinaware. Such agreement restrained Robert Haviland's partnership from " * * * making use of the name 'Haviland', in any form whatsoever * * * other than by incorporating it in the wording 'Robert Haviland et le Tanneur' * * *". When this agreement was entered into, William D. Haviland neither claimed ownership of the Haviland trademark nor intended to manufacture or sell Robert Haviland chinaware.

74. The agreement of February 18, 1941, between the liquidators of Porcelaines G.D.A., on the one hand, and William D. Haviland, his wife, and his

sisters and brothers-in-law on the other hand (Finding #47), purported to transfer to the latter the Charles Field Haviland and G.D.A. trademarks. Neither William D. Haviland, his wife, or his sisters or brothers-in-law intended, at the time of such agreement, to manufacture or sell chinaware bearing either the Charles Field Haviland or G.D.A. trademarks.

75. The agreement entered into in 1948 between William D. Haviland and Jean Haviland (Finding #62) purported to assign to William D. Haviland the

"* * * exclusive right of utilizing and of registering for all ceramics any trademarks bearing the word 'Haviland' in combination with the Christian name, 'Jean', or a translation thereof in any foreign language whatsoever, except German * * *".

William D. Haviland, at the time of such agreement, had no intention of manufacturing or selling chinaware bearing the trademarks Jean Haviland or John Haviland, or bearing marks combining any other form of the christian name Jean with the surname Haviland.

76. William D. Haviland's purpose in entering into the preceding agreements was to prevent others, whether or not members of the Haviland family, from using the Haviland surname in the chinaware field.

77. Since its initial adoption, after the Second World War, of the Haviland and Haviland France trademarks, plaintiff has represented itself as the "* * * original * * * Haviland Company, which was founded in 1842 * * *". While plaintiff can perhaps because of a general consensus of Haviland descendants correctly represent itself as the present standard bearer of the original Haviland Company founded in 1842, its statements to prospective purchasers and others that it is the same company which imported and sold Haviland Limoges chinaware, commencing in the middle of the nineteenth century, are lacking in historical and juridical accuracy.

78. Plaintiff has represented in good faith to the chinaware trade, and to the public, that no member of the Haviland family is or ever has been associated with the German corporation, the defendant Waldershof, that defendants have no right to use the Johann Haviland trademark, and that anyone selling Johann Haviland brand china in this country is liable to the plaintiff.

*The Issue of Infringement*

79. Plaintiff's Haviland and Haviland France chinaware may be characterized as expensive "open stock" china, which is primarily sold by individual five-piece place settings. Such place settings are sold at retail prices varying from $19.95 to $66.00 per place setting. Plaintiff's imported chinaware is marketed as a French or Limoges product, and is by law so marked. The name Haviland, particularly when it has been associated with France or Limoges, has acquired a widespread reputation for chinaware of the highest quality.

80. Johann Haviland Bavarian chinaware, on the other hand, comes within the category of inexpensive "promotional" china of lower grade. Eighty per cent of all Johann Haviland china sold in this country is marketed in the form of complete ninety-three-piece service for twelve dinner sets. Such dinner sets are sold at retail prices varying from about $79.95 to $99.95 per set. Defendants' Johann Haviland china is marketed as a German or Bavarian product, and is by law so marked, as distinguished from French or Limoges ware.

81. Plaintiff's Haviland and Haviland France chinaware, and defendants' Johann Haviland Bavarian chinaware are sold at different price ranges in many of the same retail outlets, including the chinaware departments of major department stores and chinaware specialty shops. Defendants' ware is additionally marketed through promotional catalog sales and supermarket chain outlets.

82. Plaintiff's and defendants' respective brands of chinaware are sometimes sold in direct competition with one another; but in most instances by reason of the distinct categories and price ranges in which such goods are sold, they are not in direct competition.

83. On October 23, 1958, plaintiff requested the Bureau of Customs to investigate importation of chinaware alleged to have been advertised as "Imported Haviland Bavarian China" and in other cases as "Johann Haviland China Made by Johann Haviland".

84. On December 11, 1958, the Bureau of Customs stated that in its opinion the words "Johann Haviland" constitute a copy or simulation of plaintiff's recorded mark Haviland within the meaning of Section 42 of the Trademark Act of 1946 and that merchandise bearing the mark Johann Haviland would be treated in accordance with provisions of Section 11.17 of the Customs Regulations. The Bureau of Customs has not, since these initial inquiries were made, taken any action to bar the importation of Johann Haviland china.

85. Defendants undertook, in 1959, to affix to each article of Johann Haviland Bavarian china imported to this country a pasted or paper label reading "Not associated with Haviland & Co. N. Y.". The evidence is insufficient to permit any conclusion as to whether the use of this paper label disavowing defendants' association with plaintiff has been helpful or harmful to plaintiff. All Johann Haviland ware marketed in the United States since 1959 has borne such a label. Prior to any contact with the Bureau of Customs in 1957, the Rosenthal-Block China Corporation had affixed to each of its invoices for sales of Johann Haviland china an information strip indicating recommended trademark advertising to its customers. Since its incorporation in 1960, the Johann Haviland China Corporation has similarly affixed such an information strip to each of its invoices. These recommendations and information strips may not be effective to protect plaintiff in the future from unfair competition from defendants' customers.

86. Neither Waldershof, nor the Johann Haviland China Corporation, has participated in cooperative advertising with its customers, supplied mats, or otherwise consulted with retailers with respect to their advertising. The only display material supplied by the Johann Haviland China Corporation to its retailers consists of plaques bearing the Johann Haviland trademark and customarily placed adjacent to chinaware displays. The defendants have incurred no substantial expense for the advertising or promotion of the Johann Haviland trademark. This policy has on some occasions in the past redounded to plaintiff's prejudice and may damage the plaintiff in the future by permitting, in effect, the untrammelled use of a Haviland mark by a growing number of retailers and customers of defendants.

87. Plaintiff has spent a substantial amount of time and effort offering for sale and selling china bearing trademarks including the name Haviland. Plaintiff's sales efforts have included publicity programs in which Frederick Haviland, great-grandson of David Haviland, has participated and also include ceremonies involving presentations of Haviland china and Haviland memorabilia to prominent citizens of this country.

88. Numerous retailers comprising, apparently, a relatively small proportion of the total number advertising Johann Haviland china, having referred to and described the china using terms such as Haviland china, J. Haviland china and terms in which the name Johann is printed in letters smaller than the name Haviland, on some occasions so much smaller as to amount to an effective suppression of the name Johann. This activity has been harmful to the plaintiff. While there is no evidence that defendants have condoned, encouraged, or participated in it, defendants have themselves continued to refrain from advertising or promoting the Johann Haviland trademark to any substantial degree. Such conduct of

defendants in the future, if defendants' business continues to expand, poses a threat of unfair competition to plaintiff.

89. Items of correspondence introduced by plaintiff to establish the purported likelihood of confusion of source evidenced Post Office misdirection and clerical errors rather than such confusion. Misdelivery to the plaintiff, at 535 Fifth Avenue or 11 East 26th Street, of mail correctly addressed to the defendant Johann Haviland China Corporation, at 225 Fifth Avenue or 21 East 26th Street, respectively, was not due to any act on defendants' part.

90. Confusion as to the source of plaintiff's and defendants' respective chinaware products has occurred in relatively few instances and is unlikely to occur in the future provided the trademark Johann Haviland is invariably used with the words "Bavaria, Germany" or "Waldershof, Germany", in letters of the same size. The differences between the parties' respective trademarks and chinaware have tended thus far to obviate likelihood of confusion of source; although the manner in which defendants' mark has been affixed to chinaware and the mode in which defendants' products have been marketed have not always been effective to assure to the plaintiff and to the purchasing public the protection to which they are entitled.

91. Defendants have made efforts (although not all the possible reasonable efforts that could have been made in the premises) to prevent mistake or confusion of prospective purchasers of their chinaware as to the source of origin thereof.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this action. 15 U.S.C. § 1121; 28 U.S.C. § 1338.

2. The complaint is dismissed, with consent of the plaintiff, as to the defendants Arthur Scholder and Rosenthal Glass & Silver Corporation.

3. Defendants' first and second counterclaims are not sustained and are dismissed with prejudice.

4. Jean Haviland, a member of the Haviland family, had the right to use his own name as a trademark or trade name for the Bavarian chinaware which he manufactured, and shipped to the United States for sale, inasmuch as he did not use his name in such a manner as to mislead or deceive the public. L. E. Waterman Co. v. Modern Pen Co., 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914); Howe Scale Co. v. Wyckoff, Seamans, & Benedict, 198 U.S. 118, 25 S.Ct. 609, 49 L.Ed. 972 (1905); Crane Co. v. Crane Heating & Air Conditioning Co., 299 F. 2d 577 (6th Cir. 1962); Horlick's Malted Milk Corp. v. Horlick, 143 F.2d 32 (7th Cir. 1944); John T. Lloyd Laboratories, Inc. v. Lloyd Bros. Pharm., 131 F.2d 703 (6th Cir. 1942); Knoedler v. Glaenser, 55 F. 895 (2d Cir. 1893).

5. Jean Haviland, having so utilized his name since 1912, had the right to continue such use or, alternatively, could transfer his business, including the trademarks and good will associated therewith, to another party. Brown Chemical Co. v. Meyer, 139 U.S. 540, 11 S.Ct. 625, 35 L.Ed. 247 (1891); Kidd v. Johnson, 100 U.S. 617, 25 L. Ed. 769 (1880); Hazel Bishop, Inc. v. Perfemme, Inc., 314 F.2d 399, 5 A.L.R.3d 1031 (2d Cir. 1963); S. C. Johnson & Son v. Johnson, 175 F.2d 176 (2d Cir.) cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); Goldwyn Pictures Corp. v. Goldwyn, 296 F. 391 (2d Cir. 1924); 1 Nims, Unfair Competition and Trade-Marks 111–13 (4th ed. 1947).

6. Defendant Waldershof is the successor in business to Jean Haviland.

7. Waldershof and its agents, as successors in business to Jean Haviland, had the right in and after 1927 to continue using Jean Haviland's name in its German form, Johann Haviland, as a trademark or trade name in connection with their chinaware business in this country. Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U.S. 554, 28 S.Ct.

350, 54 L.Ed. 616 (1908); Dr. S. A. Richmond Nervine Co. v. Richmond, 159 U.S. 293, 16 S.Ct. 30, 40 L.Ed. 155 (1895); International Silver Co. v. Oneida Community, 73 F.2d 69 (2d Cir. 1934), cert. denied, 295 U.S. 741, 55 S.Ct. 653, 79 L.Ed. 1688 (1935); Chickering v. Chickering & Sons, 215 F. 490 (7th Cir. 1914).

■ 8. Waldershof, its agents and its customers, have not abandoned their right to use the Johann Haviland name as a trademark or trade name in connection with their chinaware business in this country. 15 U.S.C. § 1127. Waldershof's forced wartime withdrawal from the American market was not an abandonment of the mark. Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1964); Stern Apparel Corp. v. Raingard, Inc., 87 F.Supp. 621 (S.D.N. Y.1949); 3 Callmann, Unfair Competition and Trade-Marks 1345–6 (2d ed. 1950).

9. Haviland & Co. (the New York partnership organized in 1892 by Charles Edward Miller Haviland and his sons) and its successor, Haviland China Co., Inc., owned the trademark rights in this country, if any, to the Haviland surname simpliciter, from 1892 to 1931. Roger & Gallet v. Janmarie, Inc., 245 F.2d 505, 44 CCPA 965 (1957).

10. No proof of French law was submitted to the Court at the trial. A New York attorney, Carlisle E. Maw, Esq., spent a substantial amount of time in 1947 at Limoges, France, preparing an agreement which was designed to transfer trademark rights in the Haviland name to the plaintiff. In the course of its preparation he apparently conducted an exhaustive study of the plaintiff's trademark history and its relationship to various Haviland chinaware enterprises in Limoges. He was not called as a witness at the trial and no reason was offered for failing to obtain his testimony.

The evidence is insufficient to sustain a conclusion with respect to the rights and obligations of the parties to the various agreements, including those executed in France under French law, purporting to transfer rights in trademarks including the Haviland name. Similarly, the relationship of such parties to the importation into the United States and the marketing in the United States of chinaware manufactured in Limoges, France, and bearing such trademarks, has not been made clear. Therefore, the Court cannot dispose of the defendants' contentions that trademark rights were invalidly assigned in gross and abandoned at various times by intermediate owners of trademarks including the Haviland surname. Moreover, the evidence is insufficient to establish plaintiff's chain of title to the Haviland trademark since 1842.

■ 11. Plaintiff's United States Trademark Registrations Nos. 538,297, 540,451 and 541,771, for the trademarks Haviland, Theodore Haviland-New York and Haviland France, respectively, are valid and subsisting. They were not procured by fraud. These registrations do not derogate from the validity of defendants' Johann Haviland trademark. The rights of plaintiff to use these trademarks have become incontestable but incontestability of a trademark registration has only a defensive, and not an offensive effect. 15 U.S.C. §§ 1065, 1115; Tillamook County Cream. Ass'n v. Tillamook Cheese & D. Ass'n, 345 F.2d 158 (9th Cir.), cert. denied, 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed. 157 (1965); John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314 (7th Cir. 1961); 4 Callmann, Unfair Competition and Trade-Marks 2075– 76 (2d ed. 1950); 1 Seidel, Dubroff and Gonda, Trademark Law and Practice 478 (1963). Incontestability has no effect on the availability of laches as a defense. Polaroid Corp. v. Polarad Electronics Corp., 182 F.Supp. 350 (E.D.N.Y. 1960), aff'd, 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed. 2d 25 (1961); 1 Seidel, supra, at 479. To the extent that dicta in cases cited by plaintiff suggest the contrary this Court regards them as unsound and declines to follow them. The plaintiff has cited Ap-

ple Growers Ass'n v. Pelletti Fruit Co., 153 F.Supp. 948 (N.D.Calif.1957); Borg-Warner Corp. v. York-Shipley, Inc., 127 U.S.P.O. 42 (N.D.Ill.1960), modified, 293 F.2d 88 (7th Cir.) cert. denied, 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961); and Richard Hudnut v. Du Barry of Hollywood, Inc., 127 U.S.P.O. 486 (S.D.Cal.1960), aff'd, 323 P.2d 986 (9th Cir.1963). This Court considers the dicta in these cases to be inconsistent with the teachings of *Tillamook,* supra; *Morrell,* supra; and *Polaroid,* supra, which are followed. Plaintiff's New York State Registration No. R–5384 for the trademark HAVILAND is valid and subsisting.

12. Plaintiff has historical priority with respect to its use of the Theodore Haviland mark (see Finding #6) which preceded defendants' use of the Johann Haviland mark.

 13. Any rights the plaintiff may have to the trademark and trade names that include the surname Haviland cannot be asserted against defendants' use of the Johann Haviland mark. With respect to plaintiff's Haviland, Haviland France, Theodore Haviland-New York and Theodore Haviland marks, the plaintiff is equitably estopped from asserting infringement by defendants. Similarly, the defendants are precluded by their long-continued acquiescence in plaintiff's concurrent use of marks containing the Haviland name, from asserting against the plaintiff any claim of exclusivity or confusing similarity. Furthermore, the rights of plaintiff to use those of the aforesaid trademarks which have become incontestable under the Lanham Act (see Conclusion of Law #11) are protected against attack by the defendants despite any claim by defendants of prior or superior rights. 15 U.S. C. §§ 1065, 1115(b), quoted in note 7; Tillamook County Cream. Ass'n v. Tillamook Cheese & D. Ass'n, 345 F.2d 158 (9th Cir.), cert. denied, 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed. 157 (1965); John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314 (7th Cir. 1961); 4 Call-

mann, Unfair Competition and Trade-Marks 2075–76 (2d ed. 1950).

 14. Defendants may interpose the equitable principles of laches, estoppel and acquiescence as against plaintiff's claim of infringement of its registered trademarks. Plaintiff's conduct for a period of many years was sufficient to justify a belief by the defendant Waldershof that plaintiff had no substantial grievance against Waldershof. 15 U.S.C. § 1069; Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct 36, 7 L.Ed.2d 25 (1961).

 15. Plaintiff's delay in failing to bring suit until 1960 was unreasonable because (a) as early as 1927, defendants' use of the Johann Haviland mark was regarded as a "looming danger," (see Finding #59). Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); and (b) for many years prior to the initiation of this lawsuit in 1960, plaintiff was aware of defendants' concurrent use of a similar mark and took no action other than sporadic complaints which were never pursued. 4 Callmann, Unfair Competition and Trade-Marks 1793, 1797 (2d ed. 1950); see Golden West Brewing Co. v. Milonas & Sons, 104 F.2d 880 (9th Cir. 1939).

 16. Plaintiff is equitably estopped from obtaining damages or injunctive relief for infringement of its alleged exclusive right to use the Haviland, Haviland France, Theodore Haviland-New York, and Theodore Haviland trademarks, as against defendants, for the following reasons:

(a) Plaintiff's conduct has been inconsistent with the assertion of such alleged exclusive rights. Plaintiff has been guilty of laches in failing to assert such rights against defendants or their predecessors for a period of more than thirty years after its first knowledge of defendant Waldershof's use of the Johann Haviland trademark;

(b) There has been bona fide reliance by the defendants upon such conduct and a change in the defendants' position based upon such reliance.

(c) The defendants would suffer irreparable injury if they were enjoined from the continued use of the Johann Haviland trademark; and

(d) The defendants have acted in good faith and without any intention of appropriating the plaintiff's alleged trademark rights.

La Republique Francaise v. Saratoga Vichy Spring Co., 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903); Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1964); Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); Anheuser-Busch, Inc. v. Du Bois Brewing Co., 175 F.2d 370 (3d Cir. 1949), cert. denied, 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1354 (1950); Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822 (2d Cir. 1943); International Silver Co. v. Oneida Community, 73 F.2d 69 (2d Cir. 1934), cert. denied, 295 U.S. 741, 55 S.Ct. 653, 79 L.Ed. 1688 (1935); France Milling Co. v. Washburn-Crosby Co., 7 F.2d 304 (2d Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925).

■ 17. Defendants' sales of Johann Haviland china at, or at any time subsequent to, the time of plaintiff's first knowledge thereof, were neither so insignificant nor so sporadic as to be *de minimis*. Accordingly, plaintiff's laches cannot be excused on such ground. See Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); Valvoline Oil Co. v. Havoline Oil Co., 211 F. 189 (S.D.N.Y.1913); cf. Warner & Swasey Co. v. Held, 256 F. Supp. 303 (E.D.Wis.1966).

■ 18. Plaintiff's laches is not excused on the ground it could not have sued defendants prior to formation of the Johann Haviland China Corporation in 1960, for the reasons that:

(a) Plaintiff could have sued any of the numerous distributors and retailers who marketed defendants' Johann Haviland chinaware in the period from 1928 up to 1960, save for the period of the Second World War. Grocers Baking Co. v. Sigler, 132 F.2d 498 (6th Cir. 1942); Walter Baker & Co., Ltd. v. Slack, 130 F. 514 (7th Cir. 1904); Shredded Wheat Co. v. Kellogg Co., 26 F.2d 284 (D.Conn.1928); cf. Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, 221 F.2d 464 (2d Cir.), cert. denied, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955); G. H. Mumm Champagne v. Eastern Wine Corp., 142 F.2d 499 (2d Cir.), cert. denied, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944); and

(b) Plaintiff could have sued defendant Waldershof at any time during the period from 1928 to 1948 when the latter's John Haviland Bavaria federal registration was in force (see Finding #32), since Waldershof had, in obtaining such registration, submitted to service of process in any proceeding affecting its ownership thereof. Act of February 20, 1905, ch. 592 § 3, 33 Stat. 725 (predecessor statute to 15 U.S.C. § 1051(d)); Electrolux Corp. v. Electrostar, 235 F. Supp. 799 (S.D.N.Y.1964).

■ 19. Plaintiff's and defendants' customers are not likely to be confused as to the respective sources of chinaware sold in different price ranges, bearing backstamps incorporating different trademarks and designations of countries of origin. Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., 256 F.Supp. 382 (S.D.N.Y.1966); Lenox, Inc. v. Jones M'Duffee & Stratton Corp., 271 F. 511 (D.Mass. 1921); International Silver Co. v. American Silver Co., 6 Cir., 37 F.2d 622 (1930).

■ 20. Defendants have exercised some care to avoid any likelihood of confusion of source with respect to plaintiff's and defendants' chinaware, and have taken certain precautions to insure proper use of the Johann Haviland

trademark by their customers. But in view of the considerable recent expansion of defendants' business in the United States and the occasions, although relatively few so far, when retailers have so used this mark as to make it confusingly similar to plaintiff's marks and thus appear to have traded on the good will inuring to plaintiff's business, the judgment filed herein shall contain provisions defining the defendant's responsibilities in this connection, cf. International Silver Co. v. Oneida Community, 73 F.2d 69 (2d Cir. 1934), cert. denied, 295 U.S. 741, 55 S.Ct. 653, 79 L.Ed. 1688 (1935), and permitting continued access by the parties to this Court with a view to perfecting such provisions and adapting them to any future change of circumstances. S. C. Johnson & Son v. Johnson, 175 F.2d 176 (2d Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949). The potentiality of a more extensive use of minute variations of plaintiff's trade names by defendants' customers poses a threat of irreparable harm to plaintiff in that such use will permit unauthorized persons to obtain the advantage and the benefit of the good name and nationwide reputation of the plaintiff. The defendants will not be permitted to acquiesce in this activity.

21. There is no likelihood of confusion of prospective purchasers arising from concurrent use by defendants of the Johann Haviland trademark and by plaintiff of the Haviland, Haviland France, Theodore Haviland, or Theodore Haviland-New York trademarks for their respective brands of chinaware provided the Johann Haviland mark is used with "Bavaria, Germany", or "Waldershof, Germany", in letters of equal size and prominence. International Silver Co. v. Oneida Community, 73 F.2d 69 (2d Cir. 1934), cert. denied, 295 U.S. 741, 55 S.Ct. 653, 79 L.Ed. 1688 (1935). It would be neither equitable nor practicable to compel defendants, as plaintiff proposes, to use the Johann Haviland name only in the following manner:

Porzellanfabrik Waldershof A. G. Vormals Johann Haviland

A German Corporation of Waldershof, Germany.

22. Plaintiff cannot claim right to relief under the New York State anti-dilution statute, since it has failed to show likelihood of confusion or unfair intent on the defendants' part. General Business Law, McKinney's Consol.Laws, c. 20, Section 368–d. Polaroid Corp. v. Polarad Electronics Corp., 182 F.Supp. 350 (E.D.N.Y.1960), aff'd, 287 F.2d 492 (2d Cir. 1961), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., 256 F.Supp. 382 (S.D.N.Y.1966); Cue Publishing Co. v. Colgate-Palmolive Co., 45 Misc.2d 161, 256 N.Y.S.2d 239, aff'd, 23 A.D.2d 829, 259 N.Y.S.2d 377 (1965).

23. The parties are directed to submit a proposed judgment consonant herewith which shall include, inter alia, provisions to the effect:

(a) That plaintiff's prayer for relief be granted only to the extent that defendants and all those acting in concert with them be permanently enjoined from using the Johann Haviland trade name apart from the two words "Bavaria, Germany", or the two words "Waldershof, Germany". All these words shall be deemed to be an integral part of defendants' trademark and shall be of equal size and prominence wherever used;

(b) That defendants shall be required to assume responsibility for and to take appropriate affirmative action to prevent any misuse of the Johann Haviland name by their customers or retailers as, for instance, its presentation to the buying public as a minute variation of plaintiff's mark or one confusingly similar thereto;

(c) That the defendant Johann Haviland China Corporation shall be required on all of its letterheads and advertising which bear such corporate name to have printed under its said name, in readily legible form, the words "Importer and

distributor of Johann Haviland Bavarian chinaware";

(d) That no damages or costs be awarded to either side;

(e) That defendants' prayer for allowance of counsel fees be denied.