**CUTLER–HAMMER, INC., Plaintiff,**

v.

**STANDARD RELAY CORP., Defendant.**

**CUTLER–HAMMER, INC., Plaintiff,**

v.

**UNIVERSAL RELAY CORP., Defendant.**

**Nos. 68 Civ. 1383, 68 Civ. 1015.**

United States District Court,
S. D. New York.

Dec. 8, 1970.

See also D.C., 285 F.Supp. 636.

Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff; Andrew O. Riteris, Milwaukee, Wis., Royall, Koegel & Wells, Herbert C. Earnshaw, New York City, of counsel.

Samuel M. Sprafkin, Mandel M. Einhorn, New York City, for defendants.

PALMIERI, District Judge.

*Preliminary Statement*

These are actions for trade-mark infringement and unfair competition which were consolidated for trial. The plaintiff is a leading and nationally known manufacturer of electrical controls. It has been in business under the same name, Cutler-Hammer, since 1893. One of its major product lines consists of relays intended for use in aircraft. They provide a means for remotely controlling the circuits for electrically operated accessories like aircraft motors,

fuel pumps, landing gear, wing flaps, wing and windshield de-icers and others.

The defendants are dealers in all types of relays, many of which they purchase as surplus from the United States Government or from terminated inventories of manufacturers. As successful bidders at government surplus sales the defendants have acquired relays at prices below those at which plaintiff originally sold them to the Government. The defendants have resold these relays at prices generally below those quoted by plaintiff and its authorized distributors.

The design of approximately 100 relays manufactured by plaintiff has been qualified to government-prescribed specifications; and their manufacture, inspection and testing are done under government inspection in accordance with the specifications. This procedure entitles Cutler-Hammer to mark such relays with appropriate Military Standard (MS) or Army-Navy Standard (AN) numbers. To assist its customers in ordering its products, Cutler-Hammer has published catalogues listing its products according to a numbered classification system. Many of plaintiff's products are sold to the Government or to manufacturers who require them for government-ordered equipment.

Both defendants have sold relays marked with plaintiff's registered trade-mark "Cutler-Hammer" and which were altered or modified in critical ways or "rebuilt" so as to present the appearance of new aircraft relays of plaintiff's current manufacture. This was accomplished by defendants' applying current MS or AN numbers to relays which bore older or no MS or AN numbers when initially sold by plaintiff. Defendants also sold as new relays of plaintiff's current manufacture, aircraft relays which had been obtained from government surplus sales and which were rebuilt, used or defective. In other instances, although the provenance of the aircraft relays acquired by defendants could not be ascertained with certainty, they were defective, used or rebuilt in vital respects. The defendant Universal

Relay Corp. (Universal) went even further. In some instances it used counterfeit nameplates or stamps bearing current and different part numbers as substitutes for older part numbers, thereby upgrading plaintiff's older aircraft relays. Universal also sold aircraft relays as new when in fact critical components had been removed and either not replaced or replaced with dangerously inadequate substitutes.

The defendants' witnesses were neither disinterested nor forthright and their testimony with respect to controverted matters was largely discredited by cross-examination or other proof in the case.

■ Plaintiff's rights as holder of a respected trade-mark were unlawfully invaded by both defendants and a clear case of the misuse of plaintiff's trade-mark has been made out. In view of the character of the conduct constituting defendants' unfair competition, the plaintiff's prayer for relief by way of damages, accounting, injunction and attorney's fees has been substantially granted. The findings of fact and conclusions of law which follow are intended to supplement and amplify what has already been said.

## FINDINGS OF FACT

### I. PARTIES

A. *Plaintiff*

1. Plaintiff, Cutler-Hammer, Inc. (Cutler-Hammer), is a corporation organized under the laws of the State of Delaware, with its principal place of business in Milwaukee, Wisconsin. It is a manufacturer of aircraft components.

B. *Defendants*

2. Defendant, Universal Relay Corp. (Universal), is a corporation organized under the laws of the State of New York, with its office and principal place of business in New York, New York.

3. Defendant, Standard Relay Corp. (Standard), is a corporation organized under the laws of the State of New York,

with its principal place of business in Pinelawn, New York.

4. Both defendants are dealers in electrical controls which they purchase principally from government surplus stocks.

## II. PLAINTIFF'S OPERATIONS

### A. Manufacture and sale of relays

5. Plaintiff is one of the nation's leading manufacturers of electrical controls and has been engaged in the manufacture, sale and distribution in interstate commerce of such controls under the name Cutler-Hammer since 1893 with annual sales in recent years exceeding $200 million. The trade-mark "Cutler-Hammer" (Federal Registration No. 545,127) was registered on July 17, 1951, in the name of the plaintiff on the Principal Register in the United States Patent Office in accordance with the Trademark Act of 1946. Plaintiff is known in the State of New York and nationally as a manufacturer of relays. One of its major product lines is comprised of aircraft relays (also sometimes referred to in the trade as Military, MS or AN relays) which have been designed for use and are principally used in aircraft and equipment associated therewith. The aircraft relays are sold by plaintiff or through its distributors at prices ranging from $14 to $200 per relay, with the price being dependent upon the particular type of relay.

6. Plaintiff's aircraft relay line includes approximately 300 different relay types, most of which have been qualified to one of the amendments of Military Specification MIL–R 6106, which prescribes the minimum requirements for relays which are intended for use in aircraft as a means for remotely controlling the making or breaking of circuits for electrically operated accessories. As a result of such qualification and compliance with prescribed production testing requirements, the qualified relays are identified on their labels and sales literature by Military Standard (MS) or Army-Navy Standard (AN) numbers. Although aircraft relays could conceivably

be used for fork-lifts, golf carts, garage door openers and other uses, the defendants failed to show a single sale of aircraft relays for such purposes.

## III. MIL–R 6106

### A. History

7. Military Specification MIL–R 6106 was first adopted shortly after World War II and superseded an earlier government specification for relays. Since its adoption, it has been revised and upgraded by amendments to keep it up to date with the more stringent requirements demanded by advances in aircraft designs. Thus, on September 20, 1955, the specification was amended by Amendment B to reflect the needs of jet aircraft, and was further amended on May 15, 1957, by Amendment C to reflect the even higher requirements of supersonic jet aircraft. The amended specifications are designated as MIL–R 6106B and MIL–R 6106C respectively. Since that date, the specification has been further amended by Amendments D, E and F to reflect further advances in technology.

### B. Changes in MIL–R 6106

8. When MIL–R 6106 is changed by a new amendment, those relays which had been qualified to and have been production tested in accordance with the previous amendment may be continued to be identified as meeting such amendment. However, the relays have to be requalified and production tested in accordance with the new amendment before they may be identified as meeting the new amendment.

### C. MIL–R 6106C

9. MIL–R 6106C introduced several new requirements and is considerably more stringent in the qualification and production testing requirements than its predecessor (MIL–R 6106B). Because of the significant changes introduced by MIL–R 6106C, the Government required that those relays which are qualified to MIL–R 6106C be identified by different MS or AN numbers from those relays which had been qualified to earlier amendments. Further, the Government

required that manufacturers adopt new part numbers for those relays which they qualify to MIL–R 6106C. The MS numbers designated by the Government Qualifying Agency to indicate compliance with MIL–R 6106C (or any succeeding amendment) contain a combination letter-number suffix, as "–D1" in MS24140–D1. The MS numbers indicating compliance with MIL–R 6106B and earlier specifications contained merely a number suffix, as "–1" in MS24140–1.

*D. Qualification*

10. In order for a relay design to be qualified to MIL–R 6106C, it must pass seventy-nine tests which must be performed in a prescribed sequence on a sample lot of ten relays. The tests and their results must be approved by the Government Qualifying Agency which administers the specification, and, qualification is only established upon the Agency's approval of the tests and results.

*E. Qualified Products List*

11. After the Qualifying Agency finds a relay design to be qualified, the qualified design is listed in the Government's Qualified Products List by the manufacturer's name, the part number of the qualified design, and the MS or AN Standard to which the design has been qualified. The Qualified Products List is relied upon by manufacturers of civilian as well as military aircraft in selecting its suppliers.

*F. Production acceptance tests*

12. Although qualification of the design permits the listing of the design by its MS or AN numbers on the Qualified Products List, such numbers may not be applied to the label of the product itself until the product passes production acceptance tests. MIL–R 6106C provides for six acceptance tests which must be performed on each production relay (Sample Plan A) and for an additional three more stringent tests which must be passed by two relays of each five hundred relay lot (Sample Plan B). If one of the two relays fails any of the tests

of Sample Plan B, the entire lot is rejected.

*G. Notice to customer in case of failure*

13. If any test failure indicates that a defect may exist in those relays which already have been shipped to a customer, the manufacturer must fully advise the customer of all defects likely to be found in the accepted product, and of the methods which may be employed to correct such defects.

*H. Packing and shipping requirements*

14. MIL–R 6106C further prescribes methods which must be employed in packaging and shipping of qualified products.

## IV. QUALIFICATION OF PLAINTIFF'S PRODUCTS

*A. Requalification to MIL–R 6106C*

15. After the issuance of MIL–R 6106C, plaintiff requalified most of its relays to the new specification. In order to obtain requalification, plaintiff was required to incorporate significant improvements in order to meet the more stringent requirements of MIL–R 6106C. For example, it had to develop and test a new glass coating for its hermetically sealed relays. It took about three years before approval was obtained. Similarly, plaintiff had to change the method of mounting relay coils to their bases in order to meet the increased vibration and torque requirements of MIL–R 6106C. In other instances the terminal markings had to be changed. After qualification of any of its designs to MIL–R 6106C, it adopted the required production acceptance tests and those relays which passed such tests were identified in its catalogues 'and on the labels of the relays by the new Cutler-Hammer parts numbers and the new Military Standard numbers which were prescribed by MIL–R 6106C.

*B. Cost of qualification and acceptance testing*

16. Plaintiff has expended between $5,000 to $10,000 per relay in conducting the MIL–R 6106C qualification tests

and approximately $200,000 annually in performing the production acceptance tests.

## V. IDENTIFICATION OF PLAINTIFF'S PRODUCT

### A. Labels and nameplates

17. The relays, as sold by plaintiff, are marked with labels (either by printed nameplates or by stamps) which identify the relay by the MS or AN number (not included if relay is not qualified), the corresponding Cutler-Hammer part number, the coil and system voltage ratings, class and other technical information. The labels bear plaintiff's registered trade-mark "Cutler-Hammer" and thereby identify plaintiff as the manufacturer. The relays are further stamped with a date code which indicates the date of manufacture. The labeling and marking requirements are prescribed by MIL–R 6106C.

### B. Sales literature

18. Plaintiff's controls are identified by their part numbers in sales literature, service and operation manuals, and are used as a means for product identification in orders, inquiries, or other correspondence pertaining to plaintiff's controls.

## VI. RELIANCE BY CUSTOMERS

### A. Reliance on MS numbers for civilian and Government use

19. The aircraft manufacturers rely upon Military Standards in procuring and using relays for use in military as well as civilian applications. The airworthiness standards of the Federal Aviation Agency, which control design of civilian aircraft, provide that conformance to Military Specification is one of the criteria for determining suitability for aircraft use (14 C.F.R. § 26.603).

### B. Reliance on labels

20. Further, aircraft manufacturers rely upon the information contained on the label of the relay and upon the reputation and integrity of the manufacturer who is identified on the label. Since it is not possible for aircraft manufacturers to test incoming production components to the degree necessary to determine whether or not they are qualified to the required specification, they must, and do, rely upon the integrity of the relay manufacturer in assuming that he produces relays in production quantities which are of like quality to those which have been subjected to qualification tests. Cutler-Hammer has established such reputation.

## VII. CUSTOMERS' PRACTICES IN CASE OF DEFECTS

### A. Returns

21. If aircraft manufacturers find that a relay is defective or does not conform to specifications, they either complain and return such relay directly to the manufacturer indicated on the relay's label, or return it to the dealer from which it was purchased.

### B. Notices

22. If aircraft manufacturers suspect that components which might be defective have been installed on delivered aircraft, they immediately notify either the Qualifying Agency in case of military aircraft, and the F.A.A. in case of civilian aircraft. They further send notices to all known aircraft operators that may have the suspect components and advise them of the status of the component, the action which will be taken by the manufacturer and the action which should be taken by the aircraft operator.

### C. Disqualification

23. If an aircraft manufacturer repeatedly receives products which it finds not to meet the qualification requirements, he has to report to the authority in charge of qualification so that the latter may make a determination of whether or not a manufacturer's product shall be removed from the Qualified Products List (32 C.F.R. § 1.1110). If the Qualified Products List indicates that two or more manufacturers are indicated as being qualified to an MS or AN number, the manufacturer has the choice of choosing another's product.

**D. Complaints regarding plaintiff's relays**

24. Since 1964, plaintiff has received numerous and frequent complaints from almost all well-known aircraft manufacturers with the complaints being based upon relays which, after inspection by plaintiff, were identified as relays which had been repainted, rebuilt, relabeled or otherwise misrepresented. Such complaints have resulted in threatened action of removal of plaintiff's relays from the Qualified Products List. It can be presumed that in many instances where manufacturers found similar defects in misrepresented relays, but did not learn of this fact because of return of the relay to its supplier, the manufacturer switched to one of plaintiff's competitors.

## VIII. SURPLUS RELAYS

**A. Condition at time of sale by Government**

25. The United States Government, when selling surplus, cannot and does not warrant the condition of the surplus goods (41 C.F.R. § 101–45.305–9(5)). One of the reasons for such prohibition is that the stored products might have deteriorated with age and thus do not comply with the specified standards controlling their manufacture.

**B. Limitations on use in aircraft**

26. Aircraft manufacturers do not purchase surplus components since they are required by government regulation to purchase new components which are of current manufacture. Further, it is essential for the aircraft manufacturer to know the history, such as history of storage of the component, and such history cannot be ascertained in cases of surplus materials. Defendants have admitted that at the time when they purchased plaintiff's relays from the Government they did not know whether or not such relays had been repainted, rebuilt, had been used, or had been damaged.

**C. Limitations on purchase for Government end use**

27. Surplus may be purchased for end use by the United States Government only if the surplus material fully complies with the specification for which it is purchased, and if such surplus is identified as surplus at the time of its sale (32 C.F.R. § 1.1208(b), (c) and (d)).

## IV. DEFENDANTS' PRACTICES

**A. General**

28. Defendants, Universal and Standard hold themselves out to the trade as legitimate relay dealers who are capable of supplying relays which meet military specifications and which are suitable for aircraft or military use. Both distribute impressive catalogues in which they offer to supply aircraft relays of Cutler-Hammer's manufacture as well as those of other known manufacturers of aircraft relays. The catalogues of both list their aircraft relays by MS or AN numbers and display plaintiff's relays in conjunction with current Military Standard numbers.

**B. Upgrading of old relays to current specifications**

29. However, behind this facade of legitimacy, both engage in the misleading practice of selling government surplus and non-qualified relays as being qualified to MIL–R 6106 and as being suitable for aircraft use. The misrepresentation is accomplished by the application of current MS or AN numbers to the labels of the surplus relays so as to convey the impression that the relays have been qualified by their manufacturer. Standard claims to accomplish this by stamps prepared from a fancy deluxe stamp kit. Universal employs a die to prepare stamps which are copies of Cutler-Hammer stamps or, in cases where the relays are labeled, it purchases copies of current manufacturer nameplates and relabels the old relays with the counterfeit nameplates.

*C. Lack of knowledge of condition of surplus*

30. When defendants purchase surplus relays, they do not know their condition nor do they seek to ascertain it as a matter of business practice, and neither appears to employ personnel qualified to evaluate the condition or technical capabilities of the purchased relays.

*D. Purpose of upgrading*

31. Both Universal and Standard upgraded the relays to current Military Specifications for the express purpose of rendering them salable for use in military as well as civilian aircraft. Both knew that the misrepresented relays were in fact used in such aircraft under the erroneous assumption that the relays had been qualified by the plaintiff; and, both knew or should have known that each such use of a misrepresented relay created the likelihood of an unjustifiable danger to the life and safety of innocent third parties.

*E. Knowledge of consequences*

32. Both Universal and Standard also knew or should have known that the malfunction of their misrepresented relays or any accident associated with such malfunction was likely to be attributed to plaintiff.

*F. Defendants' sales methods*

33. Both defendants sold to aircraft suppliers.

34. At times, both Universal and Standard sold through intermediaries who knew, or should have known, the true nature of the misrepresented relays. The intermediaries were in a position to disclaim knowledge of their source of supply or the true condition of the relays in the event that the condition of the relays was questioned by the end user. Since aircraft relays were almost always sold solely by the MS or AN numbers, and since the same MS or AN numbers could apply to the relays of two or more manufacturers, the tracing of individual misrepresented relays from the aircraft manufacturer through the sub-contractors and dealers to the defendants could be frustrated or rendered almost impossible by the intermediaries.

## X. FULTON TRANSACTION

35. The defendants' practices in misrepresenting plaintiff's relays was illustrated by Universal's sales of four relays to Robert Fulton Company.

*A. Condition of Fulton relays*

36. On September 16, 1969, Robert Fulton Company, a manufacturer of air and sea rescue systems for the United States Government, ordered four Cutler-Hammer AN 3380–1 relays from Universal. They are referred to hereinafter as the Fulton Relays. The order was filled by Universal with four relays which had been rebuilt, repainted and restamped by Universal. The relays were defective and not qualified to AN 3380–1 in the following respects:

a. their mounting brackets had been painted, thereby destroying the proper electrical connection to ground which is provided by Cutler-Hammer on its AN3380–1 relays. The condition could produce a fatal shock;

b. their bases and covers were varnished, after they had been sold by Cutler-Hammer;

c. their original molded gaskets had been removed and replaced by cut gaskets, one of which was tested and found to be made of a rubber which was not suitable for aircraft use;

d. they contained steel hardware where copper or brass is required, and non-steel hardware where steel is required. Because of these defects, it is probable that the coil of the relay would separate from the base when the relay is used for its intended purpose;

e. some of their original terminal washers had been removed and replaced by silver plated steel washers which could create a corrosion problem; and

f. two of the relays contained coil leads which had not been used by Cutler-Hammer since the early 1950's, three of the relays did not contain a fea-

ture which was adopted by Cutler-Hammer prior to 1955 for the purpose of increasing the vibration capability of the relay.

### B. Repainting and rebuilding

37. In repainting relays, Universal disassembled a quantity of relays of the same type, separated the like components, replaced or repaired such components and thereafter assembled a relay from the segregated components. The reassembled relay could thus consist of several components, each of which had been part of a different original relay before its disassembly. After reassembly, Universal relabeled the relays by a stamp or nameplate both of which were copies of the stamps or nameplates used by Cutler-Hammer. This reassembly practice was followed in respect to the Fulton relays as well as in respect to relays sold by Universal to others.

### C. Violation of Preliminary Injunction

38. By applying a copy of plaintiff's AN3380–1 labels to the four Fulton relays after they had been rebuilt as set forth in findings 36 and 37, supra, Universal unequivocally represented that the claim to qualification of the four rebuilt and defective relays was made by plaintiff and not Universal. This conduct was a patent violation of the letter and the spirit of the order of this court (Bryan, J.) of April 4, 1968, enjoining

    " * * * Universal from selling relays with plaintiff's trademark except with the original labels and descriptions * * *"

and ordering that

    " * * * any further claims for the relays must be clearly stated to emanate from Universal and not from Cutler." *

### XI. KAMAN–GRUMMAN TRANSACTION

39. The defendants' modus operandi was also demonstrated by the Universal-Atlas-Kaman-Grumman transaction.

### A. Kaman's requirements

40. During 1967 and 1968, Kaman was building aircraft wing assemblies for the Grumman Corporation and in connection with this project required a total of 2,234 aircraft relays. Their requirements were for new relays which qualified to the following MIL–R 6106C Military Standard Numbers:

| Quantity | MS Number |
|----------|-----------|
| 223 | MS24185–D1 |
| 223 | MS24187–D1 |
| 1,664 | MS24166–D1 |
| 224 | MS24171–D1 |

### B. Purchases from Atlas

41. Kaman placed its orders with Atlas Electronics. The relays were ordered solely by their MS numbers. Kaman expressly requested that Atlas furnish it with certificates of compliance indicating that the relays which were shipped pursuant to such orders would in fact meet the requirements of the Military Specifications.

### C. Atlas' purchases from Universal

42. Atlas purchased the following amounts of its requirements from Universal:

| Quantity | MS Number |
|----------|-----------|
| 148 | MS24185–D1 |
| 108 | MS24187–D1 |
| 1,044 | MS24166–D1 |
| 148 | MS24171–D1 |

The Atlas purchase orders and Universal's invoices all identified the relays solely by their MS numbers. The balance of the Kaman order was filled by purchases from AM Aircraft Parts and included one lot of 520 MS24166–D1 relays manufactured by Leach, a competitor of plaintiff.

43. Universal filled the Atlas orders with Cutler-Hammer relays which had been government surplus. They were de-

---

* The relabeling is also prohibited by MIL–R–6106C § 4.2.2 which provides that "[i]f a [qualified] product is later modified in any way, the modified form shall be subject to and shall pass the same Qualification Tests."

fective or misrepresented in one or more, and in some cases all, of the following respects:

a. when originally sold by Cutler-Hammer, they were qualified to MIL–R 6106B (or an earlier specification) and identified by an AN number. The relays were relabeled by Universal to indicate qualification to MIL–R 6106C and conformance to an MS number. The relabeling was done by stamps which were copies of Cutler-Hammer stamps;

b. they were rebuilt by using components of several separate relays;

c. they contained components which had been used, oxidized or otherwise tarnished and were replated by Universal;

d. they were repainted, thereby obliterating the date code and in many instances destroying the ground connection of the relay;

e. they contained replaced gaskets or hardware;

f. they had various components missing;

g. they had cracks in their bases or covers; and

h. they contained parts which were of World War II vintage.

### D. Kaman rejection

44. Throughout 1967 and 1968, Kaman rejected a substantial number of the relays furnished by Universal through Atlas. The largest rejection was the rejection of forty-four MS24166–D1 relays because they contained cracks in the covers. Numerous other relays were returned for reasons such as broken retaining studs, cracks in the covers, incomplete assembly and missing components, various parts missing, etc.

45. Subsequently, Grumman returned one malfunctioning MS24185–D1 relay which was removed from the wing assembly furnished to it by Kaman. Grumman complained to Kaman and Kaman returned five MS24166–D1 relays to plain-

tiff. Both the Grumman and Kaman relays were found to be rebuilt, repainted and misrepresented as to their MS numbers. Thereafter, Kaman rejected all of the relays and removed those relays which had already been incorporated in the Grumman wing assemblies. A substantial portion of the relays had already been sent to Grumman as components of the wing assemblies.

## XII. EXTENT OF MISREPRE-SENTATION

### A. Grumman

46. The Fulton and Kaman transactions are not isolated instances. Grumman found misrepresented H200 relays which contained a stamp bearing a distorted numeral "6". This numeral identified the stamp used by Universal. The misrepresented relay had been obtained by Grumman directly; however, its documents were not sufficient to identify its purchase order.

### B. Saturn

47. Saturn Electronics of Houston returned one relay, relabeled H200, to plaintiff with the complaint that the relay was improperly assembled. That relay was obtained by Saturn from a Ben Goulston of Dallas, Texas. It bore the distorted numeral "6" which identifies Universal's stamp, and was repainted, rebuilt, and misrepresented in the same manner as the Kaman relays.

### C. Heliparts

48. Universal filled substantial orders for MS24166–D1 relays and others with the purchase order requiring that the shipment of relays must be accompanied by a certificate of compliance that the materials conform to the specifications. Universal has admitted that it issued certificates of compliance for aircraft relays but claims not to know whether or not it issued them in respect to plaintiff's relays.

### D. Purchases of nameplates

49. The extent of Universal's practices is indicated by the fact that it pur-

chased at least 20,000 aircraft relay nameplates over a period of less than two years. The nameplates were used to relabel those relays which originally were sold with nameplates and not with stamped labels. Universal appears to have had another source of nameplates.

## XIII. DEFENDANTS' CONDUCT IN LITIGATION

### A. *Pretrial position*

50. Throughout the discovery and pretrial period, both defendants maintained that the only instance in which they had applied MS or AN Standard numbers to relays which were not qualified to such standards were the two instances on which plaintiff had based each of its complaints. By maintaining this position, they sought to conceal the extent of their activities, to represent plaintiff's claim as being de minimis, and to frustrate plaintiff's legitimate pretrial inquiries.

### B. *False answers to interrogatories*

51. In order to maintain this concealment, Universal chose to frustrate plaintiff's pretrial discovery with respect to their representations by giving false answers to plaintiff's interrogatories:

(i) Interrogatory 18: "To what parties * * * has the defendant sold or delivered Cutler-Hammer relays?

Answer: Four of the five relays which had been relabeled and renumbered with CH6042H155 * * * and one * * * which had been relabeled and renumbered with CH6042H152 * * * were sold to * * * Foreign Trade & Eng. * *

Interrogatory 18 was answered falsely apparently in order to conceal those sales of which plaintiff had not learned independently. The sales to Goulston and Atlas were concealed in direct violation of an order of this court.

(ii) Interrogatory 10: Has the defendant stamped, painted, printed, or otherwise applied a Military or Army-Navy Standard Number to a Cutler-Hammer relay or its nameplate without removing the name-

plate from such relay? * * * please identify each such number * * *

Answer: "No."

This interrogatory was answered falsely to conceal those cases of which plaintiff had not learned independently. The stamping of the Kaman and Goulston relays was not revealed.

(iii) Interrogatory 8: Please list all of the sources, if any, from which defendant has purchased or procured nameplates * * *

Interrogatory 8 was answered falsely as it does not list at least two sources of 6041H155 labels. At trial plaintiff proved that Universal had procured two types of 6041H155 nameplates and that one of the types could not have originated from the order identified in the answer.

### C. *Goulston-Saturn transaction*

52. The Goulston-Saturn transaction is illustrative of the efforts made to conceal and the heavy burden placed upon plaintiff's discovery by false answers.

a. Plaintiff inquired about sales to Goulston in the April 8, 1968 deposition of defendant Universal's president, Greenberg, who refused to answer.

b. On September 4, 1968, plaintiff noticed Goulston for a deposition in Dallas, Texas. Universal filed a motion requesting that the deposition be stayed until plaintiff pay Universal $500 in expenses and $1,000 in attorneys' fees required for counsel to attend deposition.

c. Plaintiff chose to avoid the expenses of the motion proceedings and sought to elicit the same information by written interrogatories to defendant Universal. Universal refused to answer. Plaintiff filed a motion to compel answers. After a court ruling requiring Universal to answer in respect to renumbered or relabeled relays, Universal answered that it had not sold renumbered relays to Goulston. At that time, plaintiff, in reliance upon the truthfulness of the an-

swer, did not pursue further investigation of the Goulston matter.

d. In 1969, plaintiff received returns of five misrepresented relays from Kaman and one misrepresented H200 relay from Grumman. These relays were restamped with a stamp having the same distorted "6" as the relay which plaintiff traced from Saturn to Goulston.

e. On March 10, 1970, plaintiff again noticed Goulston for a deposition in Texas. Universal again moved to quash or in the alternative, for payment of the $500 in expenses and the $1,000 payment in attorneys' fees. The notice of taking deposition was quashed. Plaintiff, however, was given leave to serve written interrogatories on Goulston. When Goulston indicated he would appear voluntarily at trial, plaintiff determined not to pursue this leave and noticed Goulston as a witness on its proposed pretrial order.

f. A week before trial Universal claimed surprise in respect to relays of the type sold to Goulston (H200 relays) and persuaded the Court to require that plaintiff furnish Universal's counsel with affidavits outlining proposed testimony of all of those witnesses whom plaintiff intended to call in respect to such relays. Plaintiff furnished such affidavits from the witnesses Browser (Fulton), Marino (Grumman), Cooke (Kaman), and Pohorenec (Atlas). It did not furnish an affidavit from Goulston.

g. At trial, Universal claimed surprise in respect to the H200 relays and requested an adjournment of the trial and an opportunity to take the deposition of plaintiff in order that Universal might familiarize itself with the H200 relays. Such adjournment was granted and plaintiff's expert, who resides in Milwaukee, Wisconsin, was made available in New York for two days of depositions.

h. Greenberg testified at trial that Universal had been instructed not to re-

number H200 or any other relays because of the preliminary injunction.

i. At trial, Universal's Greenberg at first failed to comply with a subpoena for records pertaining to Goulston. The court ordered production and upon production the records showed that Universal had one sale to Goulston.

j. After many days of trial and after plaintiff had rested, Universal's Greenberg admitted restamping H200 relays. The stamp which appeared on the Kaman relays which Universal admits to have restamped is identical to that of the one on the relay obtained by Saturn from Goulston.

k. Universal knew of plaintiff's inquiries as to the Goulston relays as early as 1968. Universal knew or should have known of its sale to Goulston in 1967. Universal knew or should have known that such sale was of the H200 relay. Universal knew it had restamped H200. The claim of surprise was not made in good faith.

D. *Failure to produce documents*

53. Universal continued to frustrate plaintiff's presentation of its case by failing to produce its files which had been subpoenaed for use during the trial. First, it failed to produce any files until ordered by the court to do so. Then, it purported to comply with the subpoena and the direct order of the court. However, it merely edited its files and removed therefrom documents which it knew to be material to plaintiff's case (for example Exhibit 54, sale of MS24142–D1 relays to Atlas), but which in Mr. Greenberg's judgment were "not produced because they were not within the issues." This was a flagrant instance of bad faith and disrespect for a court order. Universal then was ordered to produce entire copies of some of the files which showed that in each and every instance Universal had dealt in wholesale quantities of relays of Cutler-Hammer's manufacture.

## XIV. STANDARD RELAY'S CONDUCT

### A. Business practices

54. The quantity of evidence against Standard was less than that adduced in the case of Universal; however, Standard's business practices were identical to those of Universal.

55. Standard considers itself to be a competitor of Universal, its sales catalogues are as misleading as those of Universal, and it is engaged in the practice of manufacturing MS stamps for the purpose of renumbering aircraft relays.

### B. Conduct at trial

56. At trial, Howard Berger, Standard Relay's president, testified that he had a conversation with a David Saltzman of American Relay, and that in such conversation he agreed to apply the MS24199–D1 number to the H86 relays. In answer to an interrogatory of plaintiff which inquired whether or not Standard had advised its customers or prospective customers that the relays offered for sale by Standard were identified by MS or AN numbers which were different from those shown on the original plaintiff's relays, Standard answered in the negative. At trial his testimony was in conflict with the answer.

## XVI. DEFENDANTS' RECORDS

### A. Condition of relays at time of sale

57. Neither of the defendants maintained records to indicate whether or not plaintiff's relays when sold by defendants had one or more of the following characteristics:

a) had been repainted, in full or in part;

b) had been reworked by the replacement of components after they had been sold by Cutler-Hammer;

c) bore Military or Army-Navy Standard Numbers which were borne by such relays at the time of their initial sale by Cutler-Hammer;

d) bore the date code which was provided on such relays by Cutler-Hammer;

e) had been used; and

f) had been damaged.

### B. Universal's knowledge

58. Universal professed not to know how many relays it had stamped with the word "refurbished."

59. Universal professed not to know the source of its stamps.

60. In some cases where an MS number was applicable to plaintiff as well as to one or more of its competitors, Universal claimed not to know whether relays sold pursuant to such MS numbers were plaintiff's or competitor's.

61. The position taken by Universal and referred to in findings 58, 59 and 60 was insincere and probably mendacious.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of these actions. 28 U.S.C. § 1332; 15 U.S.C. §§ 1114(1), 1121, 1125(a); 28 U.S.C. § 1338.

2. The plaintiff has sustained its actions for common law unfair competition in that the defendants have competed unfairly by misrepresenting aircraft relays of plaintiff's manufacture in respect to their qualification to military specifications and quality. Unfair competition of this type also constitutes trade-mark misuse within the meaning of 15 U.S.C. § 1125.

3. The procedures and tests for qualification of aircraft relays are set forth in MIL–R–6106C and the Wright Air Development Center is the only agency which may qualify a product to MIL–R–6106, 32 CFR § 1.1102 (MIL–R–6106C ¶ 6.3.1).

4. The definition of qualification and of qualified products is set forth in 32 CFR § 1.1101 as follows:

"(a) * * * Testing of a product for compliance with the requirements of a specification in advance of, and dependent of any specific procurement action, is known as qualification testing. The entire process by which

products are obtained from suppliers, examined and tested, and then identified on a list of qualified products is known as qualifications."

"(b) Qualified products are those products which, in accordance with specifications containing qualification requirements, have been subjected to examination and tests and have been found to satisfy all requirements of the applicable specification."

5. The defendants admit that the military standards and Army-Navy standards established under MIL–R–6106C cannot be applied to surplus relays which have not been qualified to such standards if the relays are intended for use by the Government or an agency thereof. The indiscriminate application of such standards is not permissible even if such aircraft relays are intended for use in civilian applications. The MS and AN numbers represent that the article to which such numbers are applied meets a test specification for aircraft relays (MIL–R–6106C ¶ 1.1). It is not a procurement specification.

6. MIL–R–6106C is not a procurement specification; other federal regulations provide for procurement. The procurement specifications for civil aircraft contemplate that military standards are to be used as a criteria for determining the suitability and durability of materials in determining their airworthiness. 14 CFR § 25.603. Similarly, the procurement regulations use military standards as a criteria in determining the suitability of products for end use by the United States Government. 4 CFR § 1–1.305–1.

7. The MIL–R–6106C specification is expressly designed to limit application of the MS and AN numbers only to those products which have been qualified and tested in accordance with the specification. It provides as follows:

3.7.2 *Use of MS or MIL designations*.—"MS or MIL designations shall not be applied to a product, until notice of approval has been received from the activity responsible for qualification."

4.2.2 *Qualification required*.— "Prior to actual procurement, the product which this specification covers shall pass the Qualification tests specified herein. If the product is later modified in any way, the modified form shall be subjected to and shall pass the same qualification tests."

8. The standards provided by MIL–R–6106C are minimum standards for the acceptance of the particular product. In the case of aircraft components such as are involved in the instant cases, these minimum standards concern themselves with matters of the safety of life and property.

9. The application of current military standard numbers by defendants to older surplus aircraft components which have not been qualified to the current military standard is a clear misrepresentation of the quality and condition of the product. The application by defendants of such numbers to aircraft relays of plaintiff's manufacture deceives the end users into purchasing and using such relays under the mistaken assumption that they have been qualified to the indicated standard by the plaintiff as their manufacturer. In addition, the defendants by such acts hold out such relays as suitable for aircraft use under the specification indicated by the misused number. Such acts constitute unfair competition, linked with fraud, as defined in Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S. Ct. 1136, 91 L.Ed. 1386 (1947). They also constitute acts in disregard of the life and safety of others.

10. The false answers given to plaintiff's interrogatories not only concealed their activities but also frustrated plaintiff's legitimate pretrial inquiries and the fair presentation of its case. These acts represent both a disrespect for this court and contempt for its orders. A heavy burden was inflicted upon the plaintiff and this court by defendants' false answers, their subsequent repeated noncompliance with subpoenas and their unsupported claims of surprise. In consequence this case can be deemed to be an exceptional case.

11. The character of the conduct giving rise to unfair competition is relevant to the remedy which should be afforded, Champion Spark Plug Co. v. Sanders, *supra*. Such conduct and the circumstances of the litigation permit the court to award attorneys' fees as part of costs. Haviland & Co., Incorporated v. Johann Haviland China Corporation, 269 F.Supp. 928 (S.D.N.Y.1967). In the present case the defendants' acts turned a case which could conceivably have been resolved by a short trial or by summary proceedings into a difficult ten day trial. Under such circumstances attorneys' fees can appropriately be awarded to plaintiff.

12. In granting equitable relief in unfair competition cases, the conduct of the unfair competitor, as well as the nature of the articles involved and the characteristics of the merchandising methods must be considered, Champion Spark Plug Co. v. Sanders, *supra*. In the present case, the nature of the article and the misrepresentation of military standard numbers is such that its misuse may endanger life and safety of others. Therefore, the plaintiff's remedy should be an injunction which would assure complete discontinuance of the unfair competition. In view of the potential danger associated with misrepresented relays and in view of the defendants' disregard of the preliminary injunction and other orders of this court, the plaintiff shall be entitled to injunctive relief.

13. The injunction shall prescribe the manner for the true identification of the nature of the product and the identity of the defendants, if defendants desire to continue to sell repainted, rebuilt, or otherwise altered components of plaintiff's manufacture. The relief should be similar to that granted in Polaroid v. Permarite, 186 F.Supp. 755 (S.D.N.Y. 1960), and in Hoover Co. v. Western Vacuum Bag Mfg. Inc., 141 USPQ 639 (S.D.N.Y.1964), where true identification of the government surplus nature of the goods and of the rebuilder were required for sun glasses and vacuum cleaner bags.

14. The injunction further shall prohibit the application of MS or AN numbers to any relay on which any physical work has been performed, unless the defendants can show that the relay on which work has been performed has been qualified. This provision is required by MIL–R–6106C § 4.3.3. Since purchasers rely upon the MS or AN numbers as indicative of compliance, this provision requires no more than is expected of any party who used MS or AN numbers.

15. Further, defendants shall, under court supervision, send notices to those parties to whom they have or may have offered misrepresented relays. Those who have purchased MS or AN relays have a right to, and rightfully expect to, receive notices if there is an indication that defects *may* exist. The defendants' having chosen to use MS numbers, must comply with the notice provision of MIL–R–6106C which provides as follows:

> "4.3.3. *Defects in items already accepted.*—The investigation of a test failure could indicate that defects may exist in items already accepted. If so, the contractor shall fully advise the procuring activity of all defects likely to be found and methods of correcting them."

Similar notices were required in Clairol Inc. v. Shapiro, 158 USPQ 427 (D.C., S.D.Cal., 1968). Since the defendants do not ascertain and profess not to know the nature of the goods that they purchase nor their condition when they are shipped, notices to all customers is necessary and reasonable.

16. The injunction shall provide for marking of surplus aircraft relays as "surplus", irrespective of whether defendants perform any work on such relays. Although government regulations provide for identification of surplus on invoices and in sales documents and require special price considerations, 32 CFR § 1.1208, and limit the normal procurement to new and unused products of

current manufacture, 41 CFR § 2–7.150–1. the evidence shows that wholesale quantities of surplus relays sold by defendants found their way to aircraft manufacturers who were deceived into believing that the relays were of plaintiff's current manufacture. Accordingly, the characteristics of the merchandising methods of defendants were such that marking of surplus aircraft relays is warranted, Champion Spark Plug Co. v. Sanders, *supra;* Polaroid v. Permarite, *supra;* Wertheimer v. Milliken, 102 USPQ 292 (S.D.N.Y.1954).

17. Plaintiff is entitled to an accounting of defendants' profits derived from the unfair competition, Monsanto Chemical Co. v. Perfect Fit Products Co., 349 F.2d 389 (2d Cir. 1965), cert. denied, 383 U.S. 942, 86 S.Ct. 1195, 1198, 16 L. Ed.2d 206, and Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 164 USPQ 117 (S.D.N.Y.1969).

18. Plaintiff is entitled to its costs in an amount to be taxed by the Clerk of the Court, to which sum shall be added as a part of such costs in the Universal case (68 Civil 1015) attorneys' fees in the amount of $10,000.00, Haviland & Co. Incorporated v. Johann Haviland China Corporation, *supra.* While the affidavits of counsel would support a substantially higher amount, the allowable fees have been reduced as an exercise of discretion.

19. Defendants' conduct in these actions has been deliberate, fraudulent and wanton. As a result, plaintiff is entitled to the recovery of exemplary damages in the amount of $2,500.00 from Universal and $1,000.00 from Standard. Singer Mfg. Co. v. Redlich, 109 F.Supp. 623 (D.C., S.D.Cal., 1952).

20. The plaintiff shall file and serve a proposed judgment consonant herewith within 10 days. It may, if it is so advised, file and serve only the amendments which it may desire to the judgment already submitted to the court and which it is assumed has also been served on the defendants. The defendants shall file and serve a counter proposed judgment within 20 days after service of plaintiff's proposed judgment or amendments as herein provided.